# UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA *v.* UNITED STATES.

Argued March 8, 1945.  Reargued April 29, 30, 1946 and October 15, 16, 1946.—Decided March 10, 1947.

*Charles H. Tuttle* argued the cause for the United Brotherhood of Carpenters and Joiners, petitioners in Nos. 6 and 7.  With him on the briefs were *Joseph O. Carson* and *Hugh K. McKevitt.*

*Joseph O. Carson II, Harry N. Routzohn, Hugh K. McKevitt* and *Jack M. Howard* submitted on briefs for the Bay Counties District of Carpenters et al., petitioners in No. 7.

*Maurice E. Harrison* submitted on briefs for petitioners in No. 8.

*Guy C. Calden* and *Clarence E. Todd* submitted on briefs for petitioner in No. 9.

*Morgan J. Doyle* submitted on brief for petitioners in No. 10.

*Assistant Attorney General Berge* and *Holmes Baldridge* argued the cause on the original argument for the United States. With *Mr. Berge* on the brief were *Solicitor General Fahy* and *Mathias Orfield.*

*Holmes Baldridge* argued the cause on the rearguments for the United States. With him on the brief were *Solicitor General McGrath, Assistant Attorney General Berge, George P. Alt* and *Robert L. Stern.*

MR. JUSTICE REED delivered the opinion of the Court.

These are criminal cases in which conviction of various defendants has been obtained in the District Court of the United States for the Northern District of California, Southern Division, and affirmed by the Circuit Court of Appeals for the Ninth Circuit, 144 F. 2d 546. They were charged with conspiracy to violate the Sherman Act, § 1.[1] The parties to the alleged conspiracy were of two groups: on the one hand, local manufacturers of and dealers in the commodities affected and their incorporated trade associations and officials thereof; and, on the other, unincorporated trade unions and their officials or business agents. The indictment charged that the defendants below unlawfully combined and conspired together, successfully, to

---

[1] 15 U. S. C. § 1:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal: . . . Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1–7 of this title to be illegal shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding $5,000, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

monopolize unduly a part of interstate commerce in mill-work and patterned lumber. The purpose and effect of the conspiracy was alleged to be to restrain out-of-state manufacturers from shipping and selling these commodities within the San Francisco Bay area of California and to prevent the dealers in that area from freely handling them. It was alleged that the conspiracy also sought to raise the prices of the products affected. To achieve the purpose, a contract was entered into between the defendants for a wage scale for members of labor unions working on the articles involved, combined with a restrictive clause, ". . . no material will be purchased from, and no work will be done on any material or article that has had any operation performed on same by Saw Mills, Mills or Cabinet Shops, or their distributors that do not conform to the rates of wage and working conditions of this Agreement," with specified exceptions not here material. This clause, it is alleged, was enforced to the mutual advantage of the conspirators by some of the parties through conference or picketing or acquiescence in the arrangement. By means of the conspiracy, union workmen obtained better wages, the employers higher profits and manufacturers against whom the conspiracy was directed were largely prevented from sharing in the Bay Area business, all to the price disadvantage of the consumer and the unreasonable restraint of interstate commerce. The legal theory which was followed in their conviction was that conspiracies between employers and employees to restrain interstate commerce violate the Sherman Act.

Five petitions for certiorari were presented to this Court by different defendants either singly or jointly with others. It is sufficient for the purposes of this review to say that they raised the question of the application of § 1 of the Sherman Act to conspiracies between employers and employees to restrain commerce and, except the petitions in the employer group, the application of § 6 of the

Norris-LaGuardia Act in a trial of such an indictment.[2] On account of the importance of the federal questions raised and asserted conflicts in the circuits, the writs of certiorari were granted.[3]

Since these cases were taken the important question of the application of the Sherman Act to a conspiracy between labor union and business groups has been decided by us. We held that such a conspiracy to restrain trade violated the Sherman Act. *Allen Bradley Co.* v. *Local Union No. 3*, 325 U. S. 797. This holding causes us to approve the ruling of the trial and appellate courts on the first question presented by the certiorari but it left unresolved the question as to the application of § 6 of the Norris-LaGuardia Act, the point to which this decision is directed.

---

[2] 47 Stat. 70, 71:

"SEC. 6. No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof."

[3] 323 U. S. 706–7. Compare *Allen Bradley Co.* v. *Local Union No. 3*, 145 F. 2d 215, and *United States* v. *International Fur Workers Union*, 100 F. 2d 541, 547, with the opinion of the Circuit Court of Appeals in this case, 144 F. 2d 546.

These cases were argued in the Supreme Court of the United States first on March 8, 1945. On June 18, 1945, they were restored to the docket and assigned for reargument, counsel being requested to discuss (1) the scope of § 6 of the Norris-LaGuardia Act in relation to prosecutions under the Antitrust Act; (2) the scope of § 6 in relationship to § 13 (b); (3) the scope of the words "association or organization" appearing in § 6, in that section's relationship to § 13 (b); and (4) consideration of the Court's oral charge and written charges requested and refused involving § 6, in the light of objections and exceptions by each and all of the defendants and the state of the evidence on that issue as to each of them. Journal, Sup. Ct., U. S., October Term 1944, pp. 284–5. The cases were reargued on April 29–30, 1946, and again restored to the docket on June 10, 1946, for a third argument.

The indictment charges a conspiracy forbidden by the Sherman Act. On that issue, the power of the trial court is limited by § 6 of the Norris-LaGuardia Act. Note 2, *supra*. The limitations of that section are upon all courts of the United States in all matters growing out of labor disputes, covered by the Act, which may come before them. It properly is conceded that this agreement grew out of such a labor dispute and that all parties defendant participated or were interested in that dispute. See § 13, 47 Stat. 73. Section 6 of the Norris-LaGuardia Act first appeared in a draft bill of the Senate Committee on the Judiciary as § 6 thereof. At that time its form was precisely the same as at present. The draft was drawn as a comprehensive substitute for S. 1482 of the 70th Congress, a bill providing only for a limitation on the jurisdiction of equity courts in the issuance of injunctions. In the 71st Congress, a similarly limited bill on the same subject, S. 2497, was reintroduced and a like comprehensive substitute proposed. Neither substitute was reported out of the Committee.[4] These substitute bills are quite similar in form to the Norris-LaGuardia Act. In substance, and therefore in effectiveness, they are the same.

In the next, the 72d Congress, the bill, H. R. 5315, which was to become the Norris-LaGuardia Act, was introduced. Section 2 succinctly states the public policy that it was designed to further—a definition of and limitation upon the jurisdiction and authority of courts of the United States in labor disputes.[5] That purpose was in accord with

---

[4] S. Rep. No. 1060, 71st Cong., 2d Sess., p. 4.

In the hearings on the proposed substitute, the language now incorporated into § 6 of the Norris-LaGuardia Act was criticized as changing the rules of agency, so as to relieve organizations of responsibility for acts of their agents in labor disputes. It was defended as intended to apply the law of agency to labor unions. Hearings, Subcommittee of the Committee on the Judiciary, U. S. Senate, 70th Cong., 2d Sess., on S. 1482, Part 5, p. 759, *et seq*.

[5] 47 Stat. 70.

that behind the earlier drafts referred to above.[6]  As the new bill was practically identical with these long considered committee substitutes, the hearings on H. R. 5315 were short.[7]  But even so, the attack continued on § 6 as a restriction on the general law of agency in labor disputes.[8] The reply of the House Committee was that it did "not affect the general law of agency" and was necessary "under the circumstances" so that "the courts should know that Congress expects them not to hold officers or associations liable for the unlawful acts of a member without clear proof of actual participation in, or authorization of, any unlawful acts by the officer or association." [9]  The Senate Committee was of the view that it was a "rule of evidence," not a "new law of agency."

> "There is no provision made relieving an individual from responsibility for his acts, but provision is made that a person shall not be held responsible for an

---

[6] S. Rep. No. 163, 72d Cong., 1st Sess.; H. Rep. No. 669, 72d Cong., 1st Sess.; S. Rep. No. 1060, 71st Cong., 2d Sess.; Hearings, Subcommittee of the Committee on the Judiciary, U. S. Senate, 70th Cong., 1st Sess., on S. 1482; Hearing, Subcommittee of the Committee on the Judiciary, U. S. Senate, 71st Cong., 2d Sess., on S. 2497.

[7] Hearing, Committee on the Judiciary, House of Representatives, 72d Cong., 1st Sess., on H. R. 5315.

[8] *Id.*, p. 16:

"But section 6 effects a revolution in the substantive law of agency. By that section no officer or member of any organization, participating in a labor dispute, and this applies equally to employers, is to be held liable in any court of the United States for the unlawful act of agents acting in such dispute, unless there be clear proof of actual participation, authorization, or ratification of the agents' acts after actual knowledge.  The general law of agency is thus repealed or restricted to a labor dispute, and it applies equally to employers and employees. It applies to men who by collusion enter into agreements which may harmfully affect the public interests, and which in some instances might be violations of the antitrust act, although they may be the result, or grow out of, or involve terms of a labor dispute."

See also pp. 33 and 39.

[9] H. Rep. No. 669, 72d Cong., 1st Sess., p. 9.

'unlawful act' except upon 'clear proof' of partici-
pation or authorization or ratification.   Thus a rule
of evidence, not a rule of substantive law, is estab-
lished." [10]

We need not determine whether § 6 should be called a rule
of evidence or one that changes the substantive law of
agency.   We hold that its purpose and effect was to relieve
organizations, whether of labor or capital,[11] and mem-
bers of those organizations from liability for damages
or imputation of guilt for lawless acts done in labor
disputes by some individual officers or members of the
organization, without clear proof that the organization or
member charged with responsibility for the offense actu-
ally participated, gave prior authorization, or ratified such
acts after actual knowledge of their perpetration.[12]

---

[10] S. Rep. No. 163, 72d Cong., 1st Sess., p. 19.

[11] "Section 6 of the bill relates to damages for unlawful acts arising
out of labor disputes.   It is provided that officers and members of
any labor organization, and officers and members of any employers'
organization, shall not be held liable for damages unless it is proven
that the defendant either participated in or authorized such unlawful
acts, or ratified such unlawful acts after actual knowledge thereof."
S. Rep. No. 163, *supra,* p. 19; 75 Cong. Rec. 4507; 47 Stat. 70, 73:
   "SEC. 13. . . .
   "(b) A person or association shall be held to be a person participat-
ing or interested in a labor dispute if relief is sought against him or it,
and if he or it is engaged in the same industry, trade, craft, or occu-
pation in which such dispute occurs, or has a direct or indirect interest
therein, or is a member, officer, or agent of any association composed
in whole or in part of employers or employees engaged in such industry,
trade, craft, or occupation."

[12] See the full statement in S. Rep. No. 163, *supra,* pp. 19–21.   Noth-
ing has been found to give definition to the word "organization" as
used in the act.   We see no reason to restrict its meaning to unincor-
porated entities.   Apparently it was employed by the draftsmen to
cover, generically, all organizations that take part in labor disputes.
See note 11, *supra.*   We so apply the word.   The corporate form, as
is true in this case, is frequently employed for trade groups.

Thus § 6 limited responsibility for acts of a co-conspirator—a matter of moment to the advocates of the bill.[13] Before the enactment of § 6, when a conspiracy between labor unions and their members, prohibited under the Sherman Act, was established, a widely publicized case had held both the unions and their members liable for all overt acts of their co-conspirators.[14] This liability resulted whether the members or the unions approved of the acts or not or whether or not the acts were offenses under the criminal law. While of course participants in a conspiracy that is covered by § 6 are not immunized from responsibility for authorized acts in furtherance of such a conspiracy, they now are protected against liability for unauthorized illegal acts of other participants in the conspiracy.

The legislative history makes the intended meaning of the word "authorization," we think, almost equally clear. The rule of liability for acts of an agent within the scope of his authority, based on the *Danbury Hatters Case,* was urged as an argument against the language of § 6.[15] When

---

[13] The *Danbury Hatters Case—Loewe* v. *Lawlor,* 208 U. S. 274, and *Lawlor* v. *Loewe,* 235 U. S. 522—involving damages against union members for their union's acts in an unlawful conspiracy, was in their minds. Hearings on S. 1482, *supra,* p. 760, *et seq.* Compare the partnership in crime theory. *United States* v. *Kissel,* 218 U. S. 601, 608; *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 253.

[14] *United States* v. *Railway Employees' Dept. A. F. L.,* 283 F. 479, 492.

[15] Hearings on S. 1482, *supra,* p. 760:

"When that came before the Supreme Court of the United States Justice Holmes—I do not remember the exact language, but he had in mind that it might not be necessary to show that they knew or ought to have known or that they ought to have been warranted in their belief—that under the rule of agency as prevailing in all other activities, including bankers' associations, to which you refer, and all other associations, it is the common accepted proposition, as fundamental as any I know in Anglo-Saxon jurisprudence, that a principal

the Senate Committee on the Judiciary reported the bill, it dealt with this contention.

> "But the argument is made that a man is held legally responsible for the acts of his agents taken in due course of employment. This argument is evidently based upon a doctrine of the civil law of negligence. It has no application to the criminal law. If a man is held responsible for an unlawful act, his responsibility rests on the basis of actual or implied participation. He is responsible for conspiring to do

---

may be liable for the acts of his agent, even though he never knew or heard of them and actually forbade them, provided he was acting within the general scope of his authority, in furtherance of the purpose of the association. That is the law laid down by the Supreme Court of the United States, and that is the law that I am afraid is curtailed by this provision in this section 6."

Excerpts from *Lawlor* v. *Loewe*, 235 U. S. at 534–35, will explain the reference: "We agree with the Circuit Court of Appeals that a combination and conspiracy forbidden by the statute were proved, and that the question is narrowed to the responsibility of the defendants for what was done by the sanction and procurement of the societies above named.

"The court in substance instructed the jury that if these members paid their dues and continued to delegate authority to their officers unlawfully to interfere with the plaintiffs' interstate commerce in such circumstances that they knew or ought to have known, and such officers were warranted in the belief that they were acting in the matters within their delegated authority, then such members were jointly liable, and no others. It seems to us that this instruction sufficiently guarded the defendants' rights; and that the defendants got all that they were entitled to ask in not being held chargeable with knowledge as matter of law. . . . If the words of the documents on their face and without explanation did not authorize what was done, the evidence of what was done publicly and habitually showed their meaning and how they were interpreted. The jury could not but find that by the usage of the unions the acts complained of were authorized, and authorized without regard to their interference with commerce among the States."

an unlawful act or for setting in motion forces intended to result, or necessarily resulting, in an unlawful act.

. . . it is high time that, by legislative action, the courts should be required to uphold the long established law that guilt is personal and that men can only be held responsible for the unlawful acts of associates because of participation in, authorization or ratification of such acts. As a rule of evidence, clear proof should be required, so that criminal guilt and criminal responsibility should not be imputed but proven beyond reasonable doubt in order to impose liability." [16]

We hold, therefore, that "authorization" as used in § 6 means something different from corporate criminal responsibility for the acts of officers and agents in the course or scope of employment.[17] We are of the opinion that the requirement of "authorization" restricts the responsibility or liability in labor disputes of employer or employee associations, organizations or their members for unlawful acts of the officers or members of those associations or organizations, although such officers or members are acting within the scope of their general authority as such officers or members, to those associations, organizations or their officers or members who actually participate in the unlawful acts, except upon clear proof that the particular act charged, or acts generally of that type and

---

[16] S. Rep. No. 163, *supra*, p. 20.

[17] See *New York Central R. Co.* v. *United States*, 212 U. S. 481, 494.

These cases now being passed upon have not involved the liability of an employer, whether a member or not of an association or organization of employers, for the acts, in a labor dispute, of his or its own officers. We express no opinion upon that.

quality, had been expressly authorized, or necessarily followed from a granted authority, by the association or non-participating member sought to be charged or was subsequently ratified by such association, organization or member after actual knowledge of its occurrence.

In this prosecution the United Brotherhood of Carpenters and Joiners and all the local unions who were convicted requested an instruction or instructions that embodied the above interpretation of § 6.[18] A similar request was made by the individual members by requested instruction No. 58. These requested instructions were refused and instead instructions were given that stated a different concept of law as is evidenced by the excerpts in the marginal note.[19]

---

[18] A fair example, requested instruction No. 56, is as follows:

"You are instructed that no labor union or organization can be found guilty in this case for an unlawful act or acts, if any, of individual officers, members or agents, unless you find upon clear proof from the evidence that such labor organization actually participated in, or actually authorized such unlawful act, if any, or ratified such an act, if any, after actual knowledge thereof."

[19] "The act of an agent done for or on behalf of a corporation and within the scope of his authority, or an act which an agent has assumed to do for a corporation while performing duties actually delegated to him, is deemed to be the act of the corporation.

"If you find that there did exist a combination and conspiracy such as is charged in the indictment, and that any defendant corporation participated therein, then I instruct you that such act of participation is deemed to be also the act of the individual director, officer or agent of such defendant corporation who authorized, ordered or did such act in whole or in part.

"Likewise, the list of defendants includes a number of labor union organizations and several members thereof. It has been stipulated in this case that these labor unions are associations. Like corporations, associations are separate entities within the meaning of the Sherman Act, and may be found guilty of violations of that act, separately and apart from the guilt or innocence of their members.

"You are to determine the guilt or innocence of the labor unions

So far as the Unions, both local and national, are concerned, the necessity under our construction for an instruction based on § 6 is apparent. The United Brotherhood was not a party to any of the agreements. Local unions took a more definitive part than the United Brotherhood. In some instances the name of a local union was signed to the agreement that contained the restrictive clause. Necessarily acts performed by or for the unions were done by their individual officers, members or agents. We do not enter into an analysis of the evidence that was relied upon to show the participation of the unions in the conspiracy. The evidence in any new trial may be quite different. No matter how strong the evidence may be of an association's or organization's participation through its agents in the conspiracy, there must be a charge to the jury setting out correctly the limited liability under § 6 of such association or organization for acts of its agents.[20] For a judge may not direct a verdict of guilty no matter how conclusive the evidence.[21] There is no way of knowing here whether the jury's verdict was based on facts within the condemned instructions, note 19 above, or on actual authorization or

which are defendants in this case in the same manner as you determine that of the corporations, that is, by an examination of the acts of their agents.

. . . . .

"In this case, several individuals are named as defendants, together with a number of corporations. While these defendants have been jointly indicted and charged with the offenses contained in the indictment, each defendant is entitled to an independent consideration by you of the evidence as it relates to his conscious participation in the alleged unlawful acts, and it is your duty to determine the guilt or innocence of each individual separately."

[20] See *Battle* v. *United States*, 209 U. S. 36, 38.

[21] *Sparf and Hansen* v. *United States*, 156 U. S. 51, 105, dissent 173. Compare *Capital Traction Company* v. *Hof*, 174 U. S. 1, 13.

ratification of such acts, note 18.[22]  A failure to charge correctly is not harmless, since the verdict might have resulted from the incorrect instruction.  We are of the opinion, therefore, that the judge should have instructed the jury as to the limitations upon the association's liability for the acts of its agents under § 6.  The error is aggravated by the failure to give the correct charge upon request.

The suggestion is made that the alert and powerful unions and corporations gain the greatest degree of immunity under our interpretation of § 6.  That is not the case.  Section 6 draws no distinction as to liability for unauthorized acts between the large and the small, between national unions and local unions, between powerful unions and weak unions, between associations or organizations and their members.  And we draw no such distinctions.

There is no implication in what we have said that an association or organization in circumstances covered by § 6 must give explicit authority to its officers or agents to violate in a labor controversy the Sherman Act or any other law or to give antecedent approval to any act that its officers may do.  Certainly an association or organization cannot escape responsibility by standing orders disavowing authority on the part of its officers to make any agreements in violation of the Sherman Act and disclaiming union responsibility for such agreements.  Facile arrangements do not create immunity from the act, whether they are made by employee or by employer groups.  The condi-

---

[22] *Bird* v. *United States,* 180 U. S. 356, 361: "The chief object contemplated in the charge of the judge is to explain the law of the case, to point out the essentials to be proved on the one side and the other, and to bring into view the relations of the particular evidence adduced to the particular issues involved."  See *Pierce* v. *United States,* 314 U. S. 306.

tions of liability under § 6 are the same in the case of each. The grant of authority to an officer of a union to negotiate agreements with employers regarding hours, wages, and working conditions may well be sufficient to make the union liable. An illustrative but nonrestrictive example might be where there was knowing participation by the union in the operation of the illegal agreement after its execution. And the custom or traditional practice of a particular union can also be a source of actual authorization of an officer to act for and bind the union.

Our only point is this: Congress in § 6 has specified the standards by which the liability of employee and employer groups is to be determined. No matter how clear the evidence, they are entitled to have the jury instructed in accordance with the standards which Congress has prescribed. To repeat, guilt is determined by the jury, not the court. The problem is not materially different from one where the evidence against an accused charged with a crime is well-nigh conclusive and the court fails to give the reasonable-doubt instruction. It could not be said that the failure was harmless error.[23]

It is suggested that since "conscious participation" was required for conviction by the instructions given, error as to the individual defendants cannot be found under any theory of the rule of § 6. But we think that failure to instruct the jury on the imputation of guilt from the acts of others as limited in labor disputes by § 6 affects the individuals as well as the associations. The section covers organizations and their members alike. Individuals, without association authority, may be guilty of such a conspiracy as this under the Sherman Act, but under § 6 they will not be guilty merely because they are members or officers of a guilty association. Nor are individuals guilty

---

[23] *Weiler* v. *United States*, 323 U. S. 606; *Bruno* v. *United States*, 308 U. S. 287.

because of acts of other individuals in which they did not participate, or which they did not authorize or ratify. Although an illegal conspiracy under the Sherman Act was proven at the trial, the individuals are entitled to have their participation weighed by a jury under an instruction explaining the circumstances under which § 6 permits acts of other individuals or of associations or of organizations in labor disputes to create personal liability. To instruct only that conscious participation of the individual is required leaves a jury free to weigh an individual's guilt in the light of unauthorized and unratified acts of others with whom he is associated but in whose acts he has not participated. As the evidence of any individual's activities in the alleged conspiracy is a minor part of the evidence as to the entire scheme, this delimitation of his responsibility is important.

Certiorari was granted to two employer groups, Nos. 8 and 10, each containing an incorporated trade association and its officers and members, both individual and corporate. Both groups combatted the indictment by demurrer on the ground that, as the restrictive agreement was directed at the maintenance of proper working conditions, it did not state a crime under the Sherman Act. The demurrer was overruled by the trial court. Our decision in *Allen Bradley Company* requires us to uphold this conclusion. Thereafter pleas of *nolo contendere* were entered by each defendant in the employer petitioner groups.

Each of the employer petitioners, if they had stood trial, as we have indicated hereinbefore, would have been entitled to the same instruction under § 6 as we have held the union group should have received. And though the failure so to charge was not excepted to, we would not be precluded from entertaining the objection.[24] The errone-

---

[24] *Wiborg* v. *United States*, 163 U. S. 632, 658; *Brasfield* v. *United States*, 272 U. S. 448, 450; see also *United States* v. *Atkinson*, 297 U. S. 157, 160. And see Rules of the Supreme Court, Rule 27.

ous charge was on a vital phase of the case and affected the substantial rights of the defendants. We have the power to notice a "plain error" though it is not assigned or specified.[25] In view of their plea of *nolo contendere,* does justice require that these employer groups should now be given an opportunity to stand trial in the situation created by our subsequent rulings in the *Allen Bradley* case and in this case? We think that it does.

This present decision furnishes a guide for the application of § 6 to liability for acts of agents in labor disputes. Ordinarily a plea of *nolo contendere* leaves open for review only the sufficiency of an indictment.[26] However, in view of the then existing uncertainty as to liability for contracts between groups of employers and groups of employees that restrained interstate commerce and the application of § 6 of the Norris-LaGuardia Act, we conclude that in this exceptional situation the employer groups, also, should have an opportunity to make defense to the indictment.[27]

The judgments in each case are reversed and the causes remanded to the District Court.

Mr. Justice Jackson took no part in the consideration or decision of this case.

---

[25] *Weems* v. *United States,* 217 U. S. 349, 362; *Mahler* v. *Eby,* 264 U. S. 32, 45; *Sibbach* v. *Wilson & Co.,* 312 U. S. 1, 16; see also *Kessler* v. *Strecker,* 307 U. S. 22, 34. And see Rules of Criminal Procedure, Rule 52 (b).

[26] *Nolo contendere* "is an admission of guilt for the purposes of the case." *Hudson* v. *United States,* 272 U. S. 451, 455; *United States* v. *Norris,* 281 U. S. 619, 622. And like pleas of guilty may be reviewed to determine whether a crime is stated by the indictment. *Hocking Valley R. Co.* v. *United States,* 210 F. 735, 738; *Tucker* v. *United States,* 196 F. 260, 262.

[27] See *Husty* v. *United States,* 282 U. S. 694, 703; *Ashcraft* v. *Tennessee,* 322 U. S. 143, 155–56; *R. F. C.* v. *Prudence Group,* 311 U. S. 579, 582; *Watts, Watts & Co.* v. *Unione Austriaca,* 248 U. S. 9, 21; *Montgomery Ward & Co.* v. *Duncan,* 311 U. S. 243, 254.

MR. JUSTICE FRANKFURTER, with whom THE CHIEF JUSTICE and MR. JUSTICE BURTON concur in result, dissenting.

The issue in this case is clear and simple. It is this. When officers make an arrangement on behalf of their organization, whether a corporation or a union, while acting in the regular course of business and within their general authority as such officers, is the organization liable for what these officers did if the court should subsequently find that such an arrangement is prohibited by the Sherman Law? The issue is clear and it is susceptible of a clear answer. Neither the issue nor the answer should be obscured. Either the organization is subject to the liability that the law in other respects imposes upon organizations for the acts of their agents, or the Norris-LaGuardia Act freed unions and corporations from such liability. The lower courts must apply the law as laid down by this Court and we owe them clarity of pronouncement. They cannot very well guide juries, or even themselves in equity suits, if told that the principles of the law of agency do not apply to unions and corporations under the Sherman Law, but that perhaps they "can" apply. What the Court means to decide ought to be brought out of the twilight of ambiguity. It does not advance the administration of justice to impart new doubts to an old statute. And the Sherman Law is not merely old. It embodies, as this Court has often indicated, a vital policy.

By explicit language Congress forbade "corporations and associations" no less than individuals to engage in combinations and conspiracies in restraint of interstate trade. Section 8 of the Sherman Law. And it has long been settled that trade unions are "associations" under the Sherman Law. *United Mine Workers* v. *Coronado Coal Co.*, 259 U. S. 344. Before the *Coronado* decision and since, repeated efforts were made to have Congress take trade unions from under the Sherman Law. Regard-

less of the political complexion of Congresses, these efforts have consistently failed. Equally futile have been efforts to have this Court read the liability of trade unions out of the Sherman Law by judicial construction. This Court has undeviatingly held that trade unions are within "the general interdict of the Sherman Law," although later enactments have withdrawn "specifically enumerated practices of labor unions" from the scope of that law. See § 20 of the Clayton Act, 38 Stat. 730, 738, 29 U. S. C. § 52; *United States* v. *Hutcheson,* 312 U. S. 219, 230, and *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469, 487–88. In the light of this history it would be strange indeed to find that Congress, by hitherto unsuspected indirection, had, from the point of view of effectiveness, sterilized the Sherman Law as to trade unions and particularly as to those which alone could to any serious extent unreasonably restrain commerce. It is a conclusion which can be reached only by disregarding the circumstances to which § 6 of the Norris-LaGuardia Act was addressed, and by wrenching it from the context of history in which it must be read.[1]

The construction given by the Court to § 6 is based on considerations which move in a world of unreality. The argument is quite unmindful of the way in which trade unions function—their organization, the authority of their international officers, the inevitable influence of the international office upon the affiliated locals. In short, such a construction is unmindful of the anatomy and physiology of trade union life. It is especially the power-

---

[1] "Sec. 6. No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof." 47 Stat. 70, 71, 29 U. S. C. § 106.

ful international unions who are in strategic positions to impose unreasonable restraints on commerce, and it is these that are especially rendered immune by the construction the Court gives to § 6. It is such unions that can most readily be insulated from responsibility for the acts of their leading officers, although such action be taken in furtherance of the vital concerns of the union and in every other aspect of legal responsibility be deemed within the direct authority of these officers and binding on the union.

It took some time for the law to catch up with reality and to hold that when men aggregated to form an entity, the entity as such acquires power and may therefore be held to responsibility in exerting its power. But it can act only through individuals. Its power is exerted, and its responsibility accrues, through the conduct of individual men entrusted with the power of the entity to achieve its purposes. This conclusion, supported alike by morality and by reason, the early law escaped through empty subtleties that seem fanciful to the modern reader. Arguments not unlike them underlie a reading of § 6 whereby the Sherman Law will be sterilized, certainly so far as national labor unions are concerned. The Court's opinion, to be sure, does not say in words that a national union is not liable under the Sherman Law for acts by its chief officers undertaken in the course of duty and for the furtherance of the union's purposes. But the conditions formulated by the Court, which must now be met before a union may be held to liability, are practically unrealizable, whether in the case of a big or a small union, a local or an international. Escape from responsibility can be easily contrived. It will be difficult to charge a union with culpability unless a convention of its membership, held perhaps every two years or even four, should knowingly authorize or approve a violation of the Sherman Law, or give *carte blanche* to the officers of the union by approving

in advance whatever they may do, no matter what the legal significance. For instance, if the president of an international union should negotiate an agreement with employers regarding hours and wages and working conditions, his union will not be responsible for the agreement, under the rule now laid down by the Court, if it should turn out to run counter to the Sherman Law, although making agreements to promote the economic betterment of its membership is the aim of the union and the job of its president.

The case before us illustrates how an association like the Brotherhood pursues its objectives. The Locals took no action until the General Office of the Brotherhood offered its approval; the President of the Brotherhood himself took an active part in the contract negotiations; a representative of the Brotherhood was present at the time that the contracts were made; no union agreement was forthcoming until the General Office approved the contracts in the routine way for such approval—collective agreements are not ordinarily subject to approval at the quadrennial convention of the Brotherhood; a circular issued by the General Office requested adherence to the contracts by the members of the local. Surely here was active "participation" by the Brotherhood in what has been found to be an outlawed combination, in the normal way in which such a union exerts its authority and "participates" in agreements. On such evidence did the jury find the Brotherhood guilty.

The Court finds that there was error in not giving a requested charge which was in the language of the statute. A trial court does not discharge its duty merely by quoting a statute relevant to the conduct of the trial. The issue before an appellate court is not whether the trial judge might have given a request of abstract correctness, or even charged differently, but whether the judge's instructions were accurate and ample. It might have been wise

for the judge to emphasize the counsel of care embodied in § 6.    But the failure to do so or to use the statutory formula is not the Court's basis for upsetting the convictions. The Court upsets the convictions because it deems erroneous the view which the trial court took of § 6.    The holding is that the view which the trial court should have taken, which all trial courts will have to take hereafter, and which, whatever the language used in the charge, must control a jury's findings from the evidence, is the elucidation which the Court now gives to § 6.    For practical purposes, this elucidation immunizes unions and corporate offenders for acts which their agents perform because they are agents and, as such, endowed with authority.    For practical purposes, a union or a corporation could not be convicted on any evidence likely to exist, if the trial court has to charge what the Court now holds to be required by § 6.

The trial court repeatedly warned the jury that to find guilt they must be satisfied beyond a reasonable doubt.    It instructed the jury that the guilt or innocence of labor unions should be determined in the same manner as that of corporations.    On the question of authorization, it charged that "The act of an agent done for or on behalf of a corporation and within the scope of his authority, or an act which an agent has assumed to do for a corporation while performing duties actually delegated to him, is deemed to be the act of the corporation."    That statement correctly expresses the standard of guilt of corporations and unions under all other criminal statutes.    If it is not the standard for violations of the Sherman Law it is only because the Court now reads in § 6 an exception to the whole of the criminal law.    Presumably trial courts will conscientiously apply the intendment of the opinion of the Court.    That means that they will have to charge juries that the rules of agency do not apply in Sherman Law cases—there must be more to hold the union for the acts of its officers.    And "more" will not be found in view of

the practical workings of unions, reinforced by the safe-guards they will naturally take on the basis of this decision.

Aside from the actualities of trade union practice, the terms of § 6, read in the light of its legislative history and its purpose, repel the result reached by the Court once "we free our minds from the notion that criminal statutes must be construed by some artificial . . . rule." *United States* v. *Union Supply Co.*, 215 U. S. 50, 55. To assure immunity to powerful unions collaborating with employers' associations in disregard of the Sherman Law, was not the purpose of § 6, and the provision should not be so read. This minor provision of the Norris-LaGuardia Act was directed against decisions by some of the federal courts in litigation involving industrial controversies. The abuse was misapplication of the law of agency so that labor unions were held responsible for the conduct of individuals in whom was lodged no authority to wield the power of the union. By undue extension of the doctrine of conspiracy, whereby the act of each conspirator is chargeable to all, unions were on occasion held responsible for isolated acts of individuals, believed in some instances to have been *agents provocateurs* who held a spurious membership in the union during a strike. Congress merely aimed to curb such an abusive misapplication of the principle of agency. It did not mean to change the whole legal basis of collective responsibility. By talking about "actual authorization," Congress merely meant to emphasize that persons for whose acts a corporation or a union is to be held responsible should really be wielding authority for such corporation or union.

The Congressional purpose behind § 6, then, is clear.[2] All that Congress sought to do was to eliminate an extrane-

---

[2] See the statement of Senator Blaine, a Committee spokesman: "I have this memorandum which I can refer to which gives the purpose of this section 6. This is merely the application of the sound

ous doctrine that had crept into some of the decisions, whereby organizations were held responsible not for acts of agents who had authority to act, but for every act committed by any member of the union merely because he was a member, or because he had some relation to the union although not authorized by virtue of his position to act for the union in what he did. And so Congress charged the federal courts with the duty to look sharply to the relation of the individual to the affairs of the organization, and not to confound individual with union unless the indi-

principles of the law of agency to labor cases. It has become necessary because the Federal courts in many cases have held the union or members not connected with the unlawful acts responsible for those acts although proof of actual authorization or ratification is wholly lacking.

"Now, that is the law of agency, and we want to apply that. We want to apply that for this reason, that if it is unjust to hold all members of the union responsible for the acts of its officers and their members merely because of such membership, similarly it is unjust to hold the officers responsible during the strike merely because they pass on questions of this kind, that an attempt is here made to recognize the rules of law of agency in labor cases." See Hearings before Subcommittee of Senate Committee on the Judiciary, S. 1482, 70th Cong., 2d Sess., p. 763.

The Senate Committee reported this: "There has been a distinct conflict of opinion in the courts as to the degree of proof required. Mere ex parte affidavits establishing a certain amount of lawless conduct in the prosecution of a strike have been held in some instances to establish a 'presumption' that the entire union and its officers were engaged in an unlawful conspiracy; and, on the other hand, other courts have declined thus to substitute inference for proof, rejecting such a doctrine in language such as the following used in a New York case: 'Is it the law that a presumption of guilt attaches to a labor union association?' Various examples of these different rulings are quoted in The Labor Injunction, by Frankfurter and Greene, pp. 74–75.

"It is appropriate and necessary to define by legislation the proper rule of evidence to be followed in this matter in federal courts. That is the only object of section 6." S. Rep. No. 163, 72d Cong., 1st Sess. (1932) pp. 20–21.

vidual is clothed with power by the union, in the ordinary way of union operation, in doing what he does for the union. A basis for liability which has entered into the warp and woof of our law, as is true of the responsibility of collective bodies for the acts of their agents, should not be deemed to have been uprooted by an enactment which merely emphasizes that basis and rules out its distortions. 1932 was too late in the day for Congress not to have known that unions, like other organizations, act only through officers, and that unions do not, any more than do other organizations, explicitly instruct their officers to violate the Sherman Law. Neither by inadvertence nor on purpose did Congress remove the legal liability of organizations for the conduct of officials who, within the limits of their authority, wield the power of those organizations. It is not lightly to be assumed that Congress would thus turn back the clock of legal history a hundred years and disregard the practicalities of collective action by powerful organizations.

Nor are the debilitating implications for Sherman Law enforcement of the construction now placed on § 6 limited to their bearing on union activities. Congress did not lay down one rule of liability for corporations and another for unions. On the contrary, it subjected both groups of organizations to the same basis and measure of liability. Both can act only through responsible agents and both are responsible as organizations only through the acts of such agents. See § 13 (b) of the Norris-LaGuardia Act.[3] If the

---

[3] "Sec. 13. When used in this Act, and for the purposes of this Act— . . . (b) A person or association shall be held to be a person participating or interested in a labor dispute if relief is sought against him or it, and if he or it is engaged in the same industry, trade, craft, or occupation in which such dispute occurs, or has a direct or indirect interest therein, or is a member, officer, or agent of any association composed in whole or in part of employers or employees engaged in such industry, trade, craft, or occupation." 47 Stat. 70, 73, 29 U. S. C. § 113 (b).

liability of a union does not flow from the acts of responsible officers acting in the due course of their authority in the pursuit of union purposes, then a corporation "interested in a labor dispute" cannot be held liable for the acts of its responsible officers acting within their customary authority in pursuit of corporate purposes. Violations of the Sherman Law by corporate officers acting on behalf of the corporation and pursuing its economic interest are not usually explicitly authorized by a formal vote of the Board of Directors or by the stockholders in annual meeting assembled.

The teaching of the present case can hardly fail. To come under the Court's indulgent rule of immunity from liability for the acts of its officers, unions will not rest on a lack of affirmative authorization. To make assurance doubly sure they will, doubtless in good conscience, have standing orders disavowing authority on the part of their officers to make any agreements which may be found to be in violation of the Sherman Law. So also, corporations "interested in a labor dispute," as, for instance, by combining to resist what they deem unreasonable labor demands, will, by the formality of a resolution at a directors' meeting, disavow and disapprove any arrangements made by their officers which run afoul of the Sherman Law. This may achieve immunity even though the officers are moving within the orbit of their normal authority and are acting solely in the interests of their corporation.

Words are symbols of meaning. In construing § 6, as in construing other enactments of Congress, meaning must be extracted from words as they are used in relation to their setting, with due regard to the evil which the legislation was designed to cure as well as to the mischievous and startling consequences of one construction as against another. "Doubt, if there can be any, is not likely to survive a consideration of the mischiefs certain to be engendered . . . . The mind rebels against the notion

that Congress . . . was willing to foster an opportunity for juggling so facile and so obvious." Cardozo, J., in *Woolford Realty Co.* v. *Rose,* 286 U. S. 319, 329–30.

Practically speaking, the interpretation given by the Court to § 6 serves to immunize unions, especially the more alert and powerful, as well as corporations involved in labor disputes, from Sherman Law liability. To insist that such is not the result intended by the Court is to deny the practical consequences of the Court's ruling. For those entrusted with the enforcement of the Sherman Law there may be found in the opinion words of promise to the ear, but the decision breaks the promise to the hope.

In our view the judgments below should be affirmed.