329 P.2d 414

**DAIRY DISTRIBUTORS, Inc., Plaintiff and Respondent,**

v.

**LOCAL UNION 976, JOINT COUNCIL 67, WESTERN CONFERENCE OF TEAMSTERS, The International Brotherhood of Teamsters, Chauffeurs, Warehousemen And Helpers Of America, AFL–CIO, et al., Defendants and Appellants.**

No. 8823.

Supreme Court of Utah.

Sept. 5, 1958.

Clarence M. Beck, A. Park Smoot, Elias Hansen, Salt Lake City, for appellants.

Hanson, Baldwin & Allen, Walter L. Budge, Salt Lake City, for respondent.

HENRIOD, Justice.

Appeal from a judgment entered on a verdict in favor of plaintiff in a case having to do with Title 29, Sec. 187, United States Code Annotated (Sec. 303, Labor Management Relations Act; June 23, 1947, c. 120, Title III, Sec. 303, 61 Stat. 158).[1] Affirmed. Costs to plaintiff.

---

1. "(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is—

"(1) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person;

"(2) forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title."

Defendants at some length have abstracted the evidence of the rather voluminous record. Understandably they have recited facts properly presentable to a jury that include those appearing most favorable to their own contentions. However, as we have indicated many times, in reviewing the facts in a case like this, we must do so in a light that most strongly supports the verdict, and we must go along with the verdict unless it clearly is not supported by any substantial evidence.

We believe the following to be a fair recital of such facts that the jury well may have believed to be true:

Prior to 1950, at Amalga, Utah, a co-operative association of milk producers, Cache Valley Dairymen's Association, managed by one Gossner, manufactured and distributed cheese over a wide area, including east and west coast points. Principal customer was Dorman & Co., New York City. In 1950 the Utah-Idaho Central Railroad discontinued business, and as a result the Association lost its railhead. Use of other railroads made competition with Wisconsin cheese in the New York area prohibitive. Under our statutes and the Association's articles, it could not operate a transportation business. Without a back haul from the east, the Association could not have competed, with its own equipment, in the New York market. It was suggested, therefore, that Gossner form a trucking company, which he and his immediate family and one other did, incorporating the plaintiff, Dairy Distributors. This corporation purchased cheese from the Association, shipped and sold it to Dorman in New York, purchasing back haul commodities there (principally calcium chlorite) for resale here.

The Association and the Corporation were separate businesses, created for different purposes, and having different shareholders. The operations of each inured to the benefit of two different groups of people. Counsel for defendants seems to have conceded all this when, objecting to the introduction of a letter addressed to the Association, he observed that the Association was "not this Dairy Distributors at all—it is a different company."

The plaintiff Corporation had an annual $1,500,000 gross operation from September, 1952, to the latter part of July, 1955, enjoying a monthly profit of about $1,000, and acquiring assets of about $50,000. During this period, plaintiff constantly had one truck headed for Dorman's with a $12,-000 cargo of perishable cheese, and one headed west with a back haul. Plaintiff

had experienced no labor trouble whatsoever with defendants, although the Association had. Local 976 had been signatory to a contract with the Association, but upon its termination, negotiations for renewal at increased wages failed. Thereafter the union suspended all of its members working for the Association for failure to cooperate with the union. It later took the position such employees were no longer members of the union, as is reflected in the banner (see cut) employed on a picket line that proved to become a vital link in the chain of events culminating in this litigation.

Since the Association and the plaintiff Corporation were separate entities and businesses, the labor problems of the Association do not appear to us to be germane to the issues here, save as they constitute an historical, causative backdrop leading to the picketing of Dorman and plaintiff's equipment, resulting in the discontinuance of plaintiff's shipments to the former.

In May, 1955, one Rash, Secretary-Treasurer of Local 976, accompanied by one Ballew, troubleshooter loaned by a Seattle labor agency to assist Local 976 in its negotiations with the Association, went to New York to see one of the Dormans. They enlisted the aid of one Ristuccia, Secretary-Treasurer of New York Local Teamster Union 277 that represented Dorman's employees, in making the approach. The conceded purpose of the visit was to urge Dorman to pressure the Association into bargaining with Local 976, and in aid thereof to urge Dorman to refuse acceptance of any more cheese manufactured by the Association.

On July 26, 1955, a load of plaintiff's cheese arrived at Dorman's dock early in the morning, as did Local 976's representatives, Rash, Ballew and one Lott. Mr. Rosen, member of the New York Teamsters' Local and Dorman's foreman, having been advised that his union had sanctioned the picketing, refused to unload the shipment. A picket banner appeared and Dorman's establishment and plaintiff's truck were picketed by Rash and Lott, and the cheese was not unloaded until five o'clock the same day. Dorman contacted Gossner in Utah and advised him that there was a picket line in front of his place of business picketing Dairy Distributors' truck, advising that his employees would

not cross the picket line and did not want to unload the cheese.

The subjoined snapshot shows the picket banner and the wording used thereon.

Plaintiff shipped no more cheese to Dorman's until about six weeks later, on September 7, when Rosen told the driver the cheese could not be unloaded until the Dormans arrived. The Dormans advised him that the union would have to be contacted. Following such contact, he was told that the union would not permit the unloading. The cheese was not unloaded but was taken elsewhere and placed in storage.

Plaintiff made one more attempt to ship cheese to Dorman's about two months later, on October 31, 1955, when the plaintiff's equipment again was picketed. Plaintiff's truck driver stated that the truck was unloaded "by Dormans and myself and a couple of the Dorman boys." Plain-

tiff made no effort thereafter to sell cheese to Dorman's, but liquidated its trucking business, a result caused by the picketing and interference with plaintiff's business dealings with Dorman. It had been made clear that Dorman's place of business and the plaintiff's equipment would be the subject of continued picketing whenever it was deemed advisable to foster the union's cause.

■ Under such circumstances it would not seem to be unreasonable for the jury to conclude that defendants, in violation of the act, induced and encouraged Dorman *and* its employees to refuse to use, process or otherwise handle or work on the commodities of the plaintiff with the objects of 1) forcing Dorman's to cease doing business with any other person and 2) forcing the Association to bargain with the union.

We think the believable facts in this case reasonably and successfully challenge the contentions of defendants' Point I and its subdivisions, which are to the effect that: Plaintiff failed to show the essential elements making compensable a violation of the act; A. Because it 1) did not show an appeal to Dorman's nonsupervisory employees, 2) who, they say, were influenced only by their employers, 3) who, in turn were the only ones appealed to by the union; B. Because it failed to show a statutory object sought by the picketing; C. Although Local 976 was not certified as bargaining agent for the Association's employees, it enjoyed a status tantamount thereto; and D. Because it failed to show an unlawful attempt by defendants to accomplish a statutory object.

Touching on some of the subdivisions of Point I, we are not convinced by the arguments of counsel for defendants relating to an equivalence of certification in the light of the facts that 1) the union had suspended its members employed by the Association, for lack of cooperation with the union which now claims to be their bargaining agent; 2) the picket banner employed, itself negatived the idea that the union was bargaining agent by clearly branding the Association's employees as "non-union" (see cut); and anyway, 3) the union's activity was at the Dorman's place of business and alongside plaintiff's truck, certification as to the Association's employees having nothing to do with the issues involved here.

To argue that certification or its equivalent had something to do with this case would be to assume that the Association, not the plaintiff, delivered the cheese to Dorman's in New York. The concession of defendants that the Association and the plaintiff Corporation were independent organizations, supported by substantial evidence in the record, does away with any

such assumption and disposes not only of the defendants' suggestion to the contrary, but of any necessity to discuss ambulatory picketing and alter ego matters, or the authorities presented by either side in support thereof.

■ As to the matter of who was induced to act, we cannot agree with defendants that there was no evidence of any appeal or inducement directed to nonsupervisory employees to refuse to unload or handle the plaintiff's commodities, because the union representatives talked only to the Dormans and the foreman Rosen. To contend so is to challenge the silent potency of a peaceful picket line, and is to ignore the very purpose of such a line: Persuasion. It is to bind oneself to the words of the picket banner, with its pointed suggestion that loyal union members (Dorman's was a union establishment) should not handle the cheese. Further, it would seem to give little credit to the understanding and reaction of Dorman's union employees by intimating that only the conversations of Rash and the others with Dorman and Rosen, and not the presence of or the suggestiveness of the picket banner, had anything to do with the refusal to handle the cheese and the subsequent demise of a profitable business. The cold facts are that after enjoying congenial and profitable business relations with Dorman's for more than two years, with deliveries of cheese at least once a week, the first picketing by the union agents ended all that, and in three and a half months thereafter plaintiff attempted but two shipments, the first being refused, requiring storage, and the second being picketed. Coupled with these facts, Dorman had advised the Association that his men would not cross the picket line and did not want to unload the cheese. It is not reasonable to believe that this course of events would have occurred without the picketing, and it is difficult to understand why the union would engage in this picketing if it were not designed to appeal to and influence the employees. We believe the jury, contrary to the contentions of defendants, reasonably could have found that the picket line 1) *did* appeal to the employees, and that 2) the Dormans *were* expressing the feeling and intentions of the employees when they announced that their men would not cross the picket line and would not unload cheese processed by the Association, and 3) that because the employees indicated they would not cross the picket line, plaintiff's relations with Dorman's, as a practical matter, were terminated.

■ Defendants' Point II contends that the Western Conference of Teamsters is exempt from this litigation, not being a labor organization within the contemplation

of Title 29, Sec. 152(5) U.S.C.A.[2] There is evidence in the record to indicate that Western Conference of Teamsters had jurisdiction over local teamster unions in the 11 western states; that Local 976, of which Rash was an officer, was affiliated with the Western Conference, and that it in turn was affiliated with the International Union. Under such circumstances we cannot say that the Western Conference of Teamsters was not a labor organization under the broad definition of the act.

The facts hereinabove mentioned, together with the facts that defendants' answer admitted that Local 976 of which Rash was an officer and Joint Council 67 engaged in picketing, the trustee for Local 976 apparently was appointed by the International Union and that Local 976 members paid part of their dues to the International, seem to dispose of defendants' Points III and IV having to do with the contention that the Western Conference and the International were strangers to this action for lack of a principal-agent relationship. We think a factual issue was precipitated such that we cannot say as a matter of law no agency existed.

■ We are not unmindful of the administrative pronouncements cited by defendants relating to agency, nor the general proposition that agency must be shown by him who asserts it. We feel that a jury reasonably could have concluded that plaintiff sustained its burden of proving agency, and we choose to go along with plaintiff's cited authorities, insofar as the facts of the instant case are concerned, and also to assert that agency, provable circumstantially, has taken on a meaning under the Taft-Hartley Act that includes ostensible authority, a matter not included within the Wagner Act.[3]

In a Ninth Circuit decision[4] involving the same legislation as we have here, the court, after referring to Title 29, Sec. 185 (e),[5] stated:

"Probably the practical result of the section in the case of labor unions was to restore the general rules of agency, particularly the rules of apparent authority which had been curtailed by

2. "The term 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."

3. 29 U.S.C.A. 151 et seq.

4. International Longshoremen's etc. Local 8 v. Hawaiian Pineapple Co., 226 F.2d 875, 880.

5. "For the purposes of this section, in determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling June 23, 1947, c. 120, Title III, § 301, 61 Stat. 156."

the Wagner Act * * * and the decision of United Brotherhood of Carpenters * * * v. U. S., 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973. We think the section was intended to cover the acts of officers of the union who deal with employers or with the public. That is, if a union puts or lets an officer or other representative get into a position where he can and does cause trouble proscribed by the act then the union is responsible."

In United Mine Workers v. Patton,[6] it was said:

"The chief argument of defendants in support of their motion for directed verdict is that there is no evidence that they authorized or ratified the strikes upon which plaintiffs rely for recovery. It is true that there is no evidence of any resolution of either the United Mine Workers or District 28 authorizing or ratifying the strikes. There is evidence, however, that the strikes were called by the Field Representative of the U.M.W., who was employed by District 28, and that he was engaged in the organization work that was being carried on by the international union through District 28, which was a mere division of the international union. Members of the union are members of local and district unions as well as the international; and of the $4 monthly dues paid by them, $2 goes to the international union, $1 to the local union and $1 to the district organization. It is clear that in carrying on organizational work the field representative is engaged in the business of both the international union and the district and that both are responsible for acts done by him within the scope and course of his employment (citing cases)."

■ Points V through IX claim error in failing to grant motions for directed verdict at various stages of the proceedings, because 1) any evidence of damage was so speculative as not to support the verdict, 2) plaintiff had no contract with the Association or Dorman's, 3) there was no evidence that Dorman's refused to purchase cheese because of the picketing, 4) Dorman's were willing to continue said purchases, and 5) because plaintiff's hauling business was an unlicensed interstate operation. All of these contentions, except 2) are supported by evidence to the contrary which the jury could have resolved and did resolve in favor of the plaintiff, which conclusions we are not constrained to upset.

As to plaintiff having no contract for any definite time with the Association or Dorman, we know of no authority that will preclude recovery of damages in a tort action because there is no such contract. Besides, there had been continuous

6. 4 Cir., 211 F.2d 742, 746.

contractual sales and purchases between plaintiff and Dorman's for better than two years. The evidence shows that the Dormans wanted deliveries and plaintiff wanted to continue to make them, and it appears that such an extended business relationship at least presumptively would have prevailed indefinitely had it not been for the unauthorized picketing.

As to Point X which claims error in rejecting an affidavit by one Corbett having to do with plaintiff's relationship with the Association, (which affidavit was filed after the trial) the facts recited therein were available to defendants during the trial by way of discovery or otherwise and there is no showing made of their nonavailability.

Point XI complains that the court erred in sustaining an objection to testimony that wages were less in another area than those paid by the Association. We can see no relevancy in such testimony as it might bear on an unlawful picketing situation between the union and the plaintiff, not the Association.

We believe the remaining points are not well taken: One having to do with admission of a letter requested to be produced by defendants, because it appears to have materiality in support of plaintiff's claim of union interference; another having to do with the introduction in evidence of an audit, because it appears to have been received without objection; and the last having to do with the contention that it was error not to have granted a new trial, because we fail to find any reasons stated therein warranting the granting thereof under our rules,[7] and defendants have failed to point out any of the grounds under said rules that would justify the granting thereof.

McDONOUGH, C. J., and WADE, J., concur.

CROCKETT and WORTHEN, JJ., concur in results.

---

7. Rule 59, Utah Rules of Civil Procedure.