HARLEM RIVER CONSUMERS COOP-
ERATIVE, INC., Appellee,

v.

ASSOCIATED GROCERS OF HARLEM,
INC., et al., Defendants,

Co-ordinated Community Service, Inc.,
Hulan Jack, Lawrence J. Overton, Lin-
wood Joseph Overton, Retail Wholesale
& Chain Store Food Employees Union,
Local 338, Defendants-Appellants.

Nos. 46–50, Dockets 71–1132, 71–1135–
71–1138.

United States Court of Appeals,
Second Circuit.

Argued Sept. 23, 1971.

Decided Oct. 7, 1971.

Cora T. Walker, New York City, for
appellee.

Leo E. Panzirer, New York City, for appellants Co-ordinated Community Service, Inc., Hulan Jack and Lawrence J. Overton.

Gloria E. A. Toote, New York City, for appellant Linwood Joseph Overton.

Lawrence R. Eno, Rosenman, Colin Kaye, Petschek, Freund & Emil, New York City (Seymour D. Lewis, Joseph Zuckerman and Arthur K. Garfinkel, New York City, of counsel), for appellant Retail, Wholesale & Chain Store Food Employees and others.

Before FRIENDLY, Chief Judge, and MULLIGAN and TIMBERS, Circuit Judges.

PER CURIAM:

In granting plaintiff's application for preliminary injunctive relief in this case, after receiving numerous affidavits and exhibits and conducting six days of hearings, Judge Mansfield, then in the District Court for the Southern District of New York, characterized the evidence as follows:

This application for preliminary injunctive relief reveals the dismal picture of labor union officials using their union's power to call a strike for the purpose of trying to coerce an employer into dealing with a private business concern owned in part by them and from which they individually derive a substantial profit.

The "private business concern" was defendant Co-ordinated Community Service, Inc. (CCS). The court found that it was nominally owned equally by Theodore Solomon, Hulan Jack, Harry Rosenblum and Lawrence J. ("Larry") Overton, all defendants herein. It further found that, in fact, Larry Overton's shares were owned by defendant Joe Overton and that Joe received regular payments from CCS. Rosenblum and Larry Overton each owned three grocery stores in Harlem, which were members of defendant Associated Grocers of Harlem, Inc., an association of more than 80 retail grocers in that area; Solomon is its executive secretary. In addition, Larry Overton was a member of the Executive Board of defendant Local 338, a union which is the bargaining agent for 15,000 food employees in New York City. Joe Overton was the Local's business agent for Harlem. Despite its altruistic sounding name, the main business of CCS was to "promote" in Harlem the products of six nationally known concerns, each with an extensive sales force of its own, to wit: Continental Baking Company, P. Ballantine & Sons, Sylvania Electric Products, Inc., the Borden Company, Ehler's spices and coffee, and White Rock Corp., for which it receives some $85,000 per year. Periodically, CCS would pay modest rebates to Associated Grocers of Harlem, Inc., apparently as one means of ensuring the allegiance of the latter's members to CCS brands. Leonard Faust, a brother-in-law of Joe Overton, served both as "merchandising supervisor" of CCS and as a section chairman of Local 338. Plaintiff Harlem River Consumers Cooperative, Inc. (the COOP) was organized in 1968 to operate a grocery supermarket which would provide Harlem residents with quality food at low prices.

The district court found that in May and June, 1968, Joe Overton, Faust and Jack endeavored, without success, to get the COOP to handle through CCS products of the six suppliers which it represented; that in November, 1968, the Overtons and Faust, on behalf of Local 338, began negotiating with the COOP for a collective bargaining agreement; that they insisted on including among the employees whom Local 338 might represent the COOP's Manager and Assistant Manager, who would have a voice in determining the amount and type of products to be purchased and the display to be given them; that when the COOP declined to sign such a contract, Local 338 called a strike on April 21, 1969; that a picket line had been established and continued, being directed and frequently manned by the Overtons and Faust; that a mobile trailer called "Joe's House" was parked nearby to

provide pickets with heat, TV and food; that violence had resulted; that the COOP had been obliged to pick up supplies at distant points; and that the variety of its merchandise and the number of its customers had seriously declined as a result of the strike and the picketing. The district judge concluded that the strike was motivated by the desire of the Overtons and Faust to force the COOP to deal with CCS, a conspiracy in violation of §§ 1 and 2 of the Sherman Act as construed in Allen Bradley Co. v. Local Union No. 3, IBEW, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945), and many subsequent decisions. He therefore granted a temporary injunction prohibiting continuation of the strike and the picketing, preventing the union from interfering with the COOP's purchasing of food and equipment or hiring of personnel, and, as regards, CCS, from granting any rebates to Associated Grocers.

Appellants assail the injunction on a large number of grounds. They claim there was no connection between what they characterize as mild efforts to get the COOP to deal with CCS in respect of products of the six companies in May and June, 1968, and the strike initiated nearly a year later; that local 338 called the strike in the course of a *bona fide* labor dispute; and, as to Local 338, that even if the Overtons engaged in illegal conduct, there was an absence of the "clear proof of actual participation in, or actual authorization of, such acts or ratification of such acts after actual knowledge thereof" required by § 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106.

A point deserving initial emphasis is that the requirement of § 6 of the Norris-LaGuardia Act applies only to the issue of union responsibility. Ramsey v. United Mine Workers, 401 U.S. 302, 307–311, 91 S.Ct. 658, 28 L.Ed.2d 64 (1971). On the many other matters here contested, such as whether the strike was called because of the COOP's refusal to deal through CCS or in good faith, the plaintiff's burden at trial will be simply to prove its case by a preponderance of the evidence. Bearing this in mind, we cannot hold that the district judge's findings of fact on these issues are clearly erroneous or that he abused his discretion in issuing a preliminary injunction with respect to the defendants other than Local 338. For reasons hereafter stated, we reach the same conclusion with respect to the latter.

The legislative history of § 6, traced in United Brotherhood of Carpenters v. United States, 330 U.S. 395, 401–407, 67 S.Ct. 775, 91 L.Ed. 973 (1947), is, as Mr. Justice Harlan said in United Mine Workers v. Gibbs, 383 U.S. 715, 743, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (concurring opinion), "admittedly vague." Three Justices thought the majority opinion in the *Carpenters* case was equally so, 330 U.S. at 413, 67 S.Ct. 775. However, we must look to that opinion, as supplemented by *Gibbs*, for guidance on the application of § 6 to the facts of this case.

Language of the Court in the *Carpenters* case [1] seems to make at least

---

1. There is no implication in what we have said that an association or organization in circumstances covered by § 6 must give explicit authority to its officers or agents to violate in a labor controversy the Sherman Act or any other law or give antecedent approval to any act that its officers may do. Certainly an association or organization cannot escape responsibility by standing orders disavowing authority on the part of its officers to make any agreements in violation of the Sherman Act and disclaiming union responsibility for such agreements. Facile arrangements do not create immunity from the act, whether they are made by employee or by employer groups. The conditions of liability under § 6 are the same in the case of each. The grant of authority to an officer of a union to negotiate agreements with employers regarding hours, wages, and working conditions may well be sufficient to make the union liable. An illustrative but nonrestrictive example might be where there was knowing participation by the union in the operation of the illegal agreement after its execution. And the custom or traditional practice of

two things clear. If a union delegates to an agent unrestricted authority going beyond the norms of union conduct, § 6 does not immunize it from liability for his illegal acts. Similarly, if it continues him in a previous position of high responsibility after knowledge of his illegal activities, § 6 affords no shelter.

 The evidence justified Judge Mansfield in concluding that plaintiff would probably prevail on one or both of these theories. The president of the Local had acknowledged before the NLRB that Joe Overton had "an exclusive control and jurisdiction over the entire area [Harlem] for the union." Mrs. Walker, the founder and guiding spirit of the COOP, testified that the president of the Local told her at a meeting that "the entire Harlem area, Harlem Local 338 situation was in the hands of Joe Overton. That he [the president] had no control over it, he was sorry about it but everything was up to Joe." To be sure, the president sought to qualify the former statement and denied the latter. But the requirement of "clear proof" in § 6 of the Norris-LaGuardia Act does not curtail the power of the trier of the facts to determine credibility. The Overtons and Faust conducted all the negotiations for Local 338; neither the president of the Local nor any member of the executive board (except Larry Overton) attended any of the bargaining sessions except for the single meeting, on November 11, 1969, where the president allegedly made the remark quoted above and admittedly made no substantive proposals. The same three men were in active charge of the picket line, the degree of Joe Overton's identification with the strike being attested by the description of the mobile trailer as "Joe's House."

The evidence also showed that, through his presence at hearings before an NLRB examiner in September, 1970, the president of the union saw documents evidencing Joe Overton's dis-

guised ownership of a 25% interest in CCS and his regular receipt of money from that organization. Yet all that the president did was to report the matter to the union's executive board. No effort was made by the union to replace Joe Overton as business agent in Harlem or even to terminate his control over the strike against the COOP.

Taking into account the totality of the evidence and the judge's apparent disbelief of certain defense witnesses, we find the requirements of § 6 of the Norris-LaGuardia Act were met. The action should, of course, be brought to as speedy a trial as the calendar of the heavily burdened and currently undermanned district court will permit.

Affirmed.

a particular union can also be a source of actual authorization of an officer to act for and bind the union. 330 U.S. at 409-410, 67 S.Ct. 775.