OVERNITE TRANSPORTATION COMPANY v. INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN & HELPERS OF AMERICA.

(Filed 2 May 1962.)

**1. Courts § 19;  Master and Servant § 14—**

29 U.S.C. 187 (a) confers jurisdiction on a State court having jurisdiction of the parties to entertain an action against a labor union under the Labor Management Relations Act to recover damages resulting from an alleged unlawful strike and secondary boycott. In such action the State court must accept the interpretation placed upon the pertinent Acts of Congress by the Supreme Court of the United States. Constitution of the United States, Art. VI, § 2; Constitution of North Carolina, Art. I, §§ 3, 5.

**2. Master and Servant § 16—**

The introduction of evidence of defendant labor union's constitution, showing control by the union over its local unions, with right to suspend a local's charter and place it in trusteeship, together with evidence that the union issued letters requesting exchange carriers not to handle cargo for plaintiff carrier, contributed to the expenses of maintaining the strike against plaintiff, and that its local unions, including local unions under trusteeship and the joint council, participated in the alleged unlawful strike and secondary boycott, *is held* sufficient to raise the question of the liability of the union under the doctrine of *respondeat superior.*

**3. Evidence § 43—**

Evidence of the education and experience of the witness over a period of years in the field of accounting *is held* sufficient to support the court's finding that the witness was an expert in cost accounting so as to render competent testimony of the witness from synopsis sheets made by him or under his direction from the original records as to the amount of loss suffered by the plaintiff in regard to the pertinent items of damage, including loss of prospective profits.

**4. Damages § 2—**

Loss of profits resulting to plaintiff from defendant's wrongful act may not be based upon mere speculation and conjecture, but may be recovered if plaintiff introduces evidence from which the amount of such loss can be ascertained by the jury with reasonable certainty.

**5. Damages § 10—**

Punitive damages are never awarded as compensation, but are awarded above and beyond actual damages in proper instances as punishment inflicted for intentionally wrongful conduct.

**6. Same;  Master and Servant § 16—**

The National Labor Management Relations Act does not authorize the recovery of punitive damages.

**7. Same—**

An action for the recovery of damages resulting from the violation of

the Labor Management Relations Act may be joined with an action to recover damages for a tort of violence under the State law, and when so joined the State court may award punitive damages under State law in proper instances, even though punitive damages may not be recovered in the cause under the Federal Act.

**8. Same—**

Where the complaint alleges a cause of action under the Labor Management Relations Act for defendant union's unlawful activities in attempting to coerce plaintiff interstate carrier to accept the union as a bargaining agent for plaintiff's employees when the union had not been certified by any authority as the bargaining agent, but the complaint does not allege a breach of the peace or any violence in connection with the alleged unlawful strike and secondary boycott, plaintiff may not recover punitive damages.

APPEAL by the defendant from *Pless, J.,* November 13, 1961, Regular "A" Civil Term, MECKLENBURG Superior Court.

In this civil action the plaintiff seeks to recover damages, actual and punitive, alleged to have been caused by the defendant's unfair labor practices in calling and maintaining a strike and secondary boycott designed to compel the plaintiff, an unorganized trucking company, to recognize the defendant as the bargaining agent for the plaintiff's employees.

Summons was issued against the defendant and served on the Secretary of State on September 3, 1959. The plaintiff filed and also served on the Secretary of State the following verified complaint:

"The plaintiff, complaining of the defendant, says and alleges:

"(1) That the plaintiff is a corporation organized, existing and doing business under and by virtue of the laws of the State of Virginia, and maintains one of its principal offices and places of business at Charlotte, North Carolina.

"(2) That the plaintiff is a common carrier, engaged in the business of transporting freight by motor vehicle.

"(3) That the defendant, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, is as the plaintiff is informed and believes, an unincorporated labor organization or Union.

"(4) That the plaintiff derives its revenues and profits from handling and transportation of direct freight, which is a freight transported from origin to destination entirely by the plaintiff, and from handling and transportation of interchange freight, which is freight not transported from origin to destination entirely by the plaintiff but interchanged between the plaintiff and other Trucking Companies and transported part of the way from

origin to destination by the plaintiff and part of the way by such other interchange Companies.

"(5) That on or about May 17, 1959, the defendant called a strike against the plaintiff for the purpose of forcing or requiring the plaintiff to recognize or bargain with the defendant as the representative of plaintiff's employees, although the defendant had not been certified as the representative of the plaintiff's employees by any Governmental agency or authority whatever.

"(6) That the defendant was not able to accomplish such purpose by the direct pressure of such strike upon the plaintiff, for despite such strike the great majority of the plaintiff's employees continued at work with the plaintiff and despite such strike the plaintiff remained ready, able and willing to render its common carrier services as it had been doing theretofore.

"(7) That the defendant, however, by an additional means and device, has prevented the plaintiff from carrying on its business in a normal way, thereby damaging the plaintiff as hereinafter set forth; that such means and device which the defendant has thus used against the plaintiff has been as follows: That the defendant has induced and encouraged the employees of the plaintiff's customers and employees of the aforesaid Trucking Companies doing interchange freight business with the plaintiff to engage in a concerted refusal, in the course of their employment, to transport or otherwise handle any goods, articles, materials, or commodities going to or coming from the plaintiff; that the object of such inducement and encouragement of the employees of the plaintiff's customers and said employees of said Trucking Companies was to force and require the said customers and Trucking Companies to cease doing business with the plaintiff and to force and require the plaintiff to recognize or bargain with the defendant as the representative of plaintiff's employees, although the defendant, as stated above, had not been certified as the representative of the plaintiff's employees by any Governmental agency or authority whatever.

"(8) That such action on the part of the defendant was wrongful and in violation of law and was taken by the defendant for the willful, deliberate and malicious purpose of injuring and damaging the plaintiff; that as a result of such action on the part of the defendant, the plaintiff has been shut off from and deprived of freight business which otherwise and normally the plaintiff would have profitably handled and has been required to pay out large sums of money for extraordinary expenses incurred by the plaintiff in its efforts to secure, handle and transport freight ship-

ments and otherwise operate its business despite the wrongful and unlawful acts of the defendant hereinabove set forth; and that in this manner and by this means the plaintiff has been grievously injured and damaged by the defendant.

"(9) That by reason of the matters hereinabove set forth the plaintiff has been injured and damaged by the defendant in the sum of $500,000.00 and is entitled to judgment against the defendant in that amount, and by reason of the defendant's deliberately, willfully and maliciously inflicting such injury and damage upon the plaintiff as hereinabove set forth, the plaintiff is entitled to judgment for punitive damages against the defendant in an additional sum of $500,000.00.

"(10) The acts of the plaintiff in the operation of its business described above affects interstate commerce within the meaning of the Labor Management Relations Act (29 U.S.C.A. 151, et seq.), and jurisdiction of this cause is conferred upon this Court by Section 303 (b) of said act (29 U.S.C.A. 187 b).

"WHEREFORE, the plaintiff prays for judgment against the defendant in the sum of $1,000,000.00, together with the cost of this action; and the plaintiff prays the Court for such other and further relief as the Court may deem just and proper."

After the court disposed of preliminary motions, the defendant, on September 29, 1960, filed the following verified answer:

"The defendant, answering the plaintiff's complaint, says:

"1. Paragraph 1 of the plaintiff's complaint is admitted.

"2. Paragraph 2 of the plaintiff's complaint is admitted.

"3. Paragraph 3 of the plaintiff's complaint is admitted.

"4. Answering paragraph 4 of the plaintiff's complaint, the defendant says that it is informed and believes that the plaintiff derives its revenues and profit at least in part from the handling and transportation of direct freight, and in part from the handling and transportation of interchange freight. Except as herein specifically admitted the defendant does not have information sufficient from which to form a belief as to the truth of the plaintiff's allegations and the same are therefore denied.

"5. Paragraph 5 of the plaintiff's complaint is untrue and denied. Upon information and belief, the dispute and such stoppages of work as occurred in the plaintiff's places of business were caused by and resulted from the plaintiff's unfair labor practices and wrongful acts toward and against its employees and their local union.

"6. Answering paragraph 6 of the plaintiff's complaint, it is

denied that this defendant sought to accomplish any such purpose as that set forth in the plaintiff's complaint by pressure either direct or indirect, and the allegations of paragraph 6 of the plaintiff's complaint, upon information and belief, are untrue and denied.

"7. Paragraph 7 of the plaintiff's complaint is untrue and denied.

"8. Paragraph 8 of the plaintiff's complaint is untrue and denied.

"9. Paragraph 9 of the plaintiff's complaint is untrue and denied.

"10. Paragraph 10 of the plaintiff's complaint is untrue and denied.

"WHEREFORE, having fully answered the plaintiff's complaint, the defendant prays that the plaintiff have and recover nothing; that this cause be dismissed, and that the plaintiff be required to pay the costs of this action."

The evidence tends to show that Overnite Transportation Company (hereafter called Overnite) is a Virginia corporation duly licensed by the Interstate Commerce Commission and by the licensing authorities of Virginia, North Carolina, South Carolina, and Georgia, to engage in the transportation of freight by motor vehicles in those States. The plaintiff maintained 33 terminals, among which the following are perimeter or gateways: Richmond, Virginia, Asheville, Charlotte, and Winston-Salem, North Carolina, Greenville and Columbia, South Carolina, and Atlanta, Georgia. At the time complained of, Overnite employed approximately 1,500 men. Its average monthly freight carriage was approximately 111,000,000 pounds, 60 per cent of which was freight picked up and delivered within its territory. The remaining 40 per cent was exchange freight, that is, (1) shipments originally received by Overnite to be transferred to other carriers for delivery, and (2) shipments received from other carriers to be delivered by Overnite. The exchanges were made pursuant to agreements. Overnite had exchange agreements with approximately 150 other carriers.

Beginning in April, 1959, the defendant International began efforts to organize Overnite's employees. The activities began in Charlotte and spread throughout Overnite's entire system. The organization attempts met with little success. The union did not, by petition or otherwise, have the National Labor Relations Board call an election to select a bargaining agent for Overnite's workers. The union, however, made demand on the plaintiff to recognize it as the bargaining agent. Overnite refused. Immediately the strike began. Picket lines were

established at plaintiff's terminals. Nevertheless the majority of plaintiff's employees continued to work and refused to honor the picket lines. Whereupon the union, through its members who were employees of other carriers, organized a boycott against movement of plaintiff's interchange freight. The union's contracts with other carriers contained clauses forbidding discharge for refusal to handle "hot cargo." Any union member who assisted in moving any freight routed over plaintiff's lines was reported to the union for discipline. As a result of the strike the volume of plaintiff's interchange freight fell off materially. In order to prevent complete stoppage of its interchange business, the plaintiff hired additional men, procured additional equipment, and obtained additional operating authority.

According to the testimony of Mr. Simmons, plaintiff's expert accountant, whose evidence will be discussed in the opinion, the plaintiff's excess cost of handling freight was $232,837.00. The cost of guard service to protect interchange freight, including the workers and their equipment during the strike, amounted to $16,662.00. Extra telephone and communication expenses amounted to $2,116.00. Extra cost in moving, including damage thereto, 20 million pounds of freight that normally would have been brought to Overnite's terminals by connecting lines amounted to $51,759.00. The extra cost of operating 23 additional trailers and nine additional tractors during the strike was $20,170.00. The above listed extra costs of operating the plaintiff's business do not take into account the loss of profits in reasonable contemplation during the period of the strike. Mr. Simmons testified that for the first four months of 1959 Overnite experienced a gross increase in its business of 22 per cent over the same period for the preceding year; that after the strike the rate of increase dropped to 16 per cent for the remainder of the year, and that the last eight months of that year should have shown a material increase.

At the trial the plaintiff introduced in evidence the defendant's constitution, Article 1, Section 2, which states the purpose of the union to be "To organize under one banner all workmen engaged in the craft, and to educate them to cooperate in every movement which tends to benefit the organization; . . ." The plaintiff likewise introduced a number of the union's agreements with lines which interchanged with plaintiff, relating to over-the-road transportation, the pickup, forwarding, and freight delivery service. The agreements protected from discharge union employees who refused to handle "hot cargo." The plaintiff introduced photostatic copies of the financial reports showing expenditures by the defendant, by its Joint Council No. 9, and by its several local unions in support of the strike. These reports showed expenditures by International and by Joint Council

No. 9 and the local unions involved during the strike activities. The evidence tended to show that approximately $40,000.00 was contributed by International and by its Council No. 9, and by Local 391 which was in trusteeship and operated directly under the order of James R. Hoffa, President of the defendant. The total expenditures in support of the strike by International, by its Council No. 9, and by the local unions involved, exceeded $125,000.00.

The defendant introduced four witnesses, each of whom was a member of the defendant union. Each testified to his participation in the strike as a member of a local union. The testimony tended to confine the strike activities to the local unions and to disassociate International from responsibility. However, Mr. Cook, one of International's witnesses, testified: "The International Union will not pay out any money in support of a strike it does not sanction."

At the close of the evidence the court submitted four issues:

"1. Was the plaintiff damaged by the wrongful actions of the defendant, as alleged in the complaint?

"2. If so, what amount, if any, is the plaintiff entitled to recover of the defendant as actual damages?

"3. Was plaintiff damaged by the reckless, wanton and malicious actions of the defendant, as alleged in the complaint?

"4. How much, if any, is plaintiff entitled to recover of defendant as punitive damages?"

In apt time the defendant requested the court to give the jury special instructions:

"The Court charges you that, under Section 303 of the National Labor Relations Act, if the plaintiff is entitled to any damages at all, it is entitled to recover only those damages it has actually sustained and the cost of this action. Under Section 303, the plaintiff is not entitled to recover punitive damages. Consequently you are instructed to answer the fourth issue, referring to punitive damages with the word, 'None.'"

The Court declined to give the requested instruction, but did charge in part as follows:

"That issue (Third) ladies and gentlemen of the jury, refers to what are known as punitive damages. The Court instructs you, reading from . . . that if you find the conduct of the defendant in respect to this strike was reckless, wanton and malicious, that it was without regard to the rights of the plaintiff, then it would be within your discretion to include in your answer to the last issues

a sum of money which you may deem proper as smart money, or punitive damages. You are not required by the law, notwithstanding what your findings as to fact may be, to include any punitive damages, but the whole matter as to whether or not you shall include punitive damages is left to your discretion, to your sound judgment, providing you shall find that the conduct of the defendant was reckless, wanton and malicious.

"Now, ladies and gentlemen of the jury, while every legal wrong entitles the party injured to recover damages. . . . sufficient to compensate for the injury inflicted, not every legal wrong entitles every party to recover exemplary or punitive damages. To warrant the allowance of such damages the act complained of must not only be unlawful, but it must also partake somewhat of a criminal or wanton nature."

The jury answered the first and third issues, Yes, the second issue, $363,193.00, and the fourth issue, $500,000.00. The court entered judgment that the plaintiff recover $363,193.00 actual, and $500,000.00 punitive damages. The defendant excepted and appealed, assigning errors.

*Blakeney, Alexander & Machen, By J. W. Alexander, Jr., Ernest W. Machen, Jr., for plaintiff appellee.*

*Robinson, Jones & Hewson, Hunter M. Jones, Francis M. Fletcher, Jr., for defendant appellant.*

*David Previant, Milwaukee, Wis., Herbert S. Thatcher, Washington, D. C., Edwin Pearce, John S. Patton, Joseph Jacobs, Atlanta, Georgia, of counsel.*

HIGGINS, J. Before us are 1,500 pages of record, exhibits and briefs. The defendant's assignments of error alone cover 165 pages of the record. They are based on 484 exceptions taken during the course of the long and hotly contested trial. Review in detail is not indicated. Procedural questions involving the service of process and motion to postpone the trial have been considered. They are without merit.

The plaintiff instituted this civil action in the Superior Court of Mecklenburg County to recover damages, both actual and punitive, alleged to have resulted from a strike and secondary boycott called by the defendant in an unlawful effort to compel the plaintiff to sign a union labor contract with plaintiff's employees. The plaintiff alleges its business "affects interstate commerce within the meaning of the Labor Management Relations Act." (29 U.S.C.A. 151, *et seq.*) Section 187(a) provides: "It shall be unlawful for the purposes of this sec-

tion only, in an industry or activity affecting commerce for any labor organization to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to . . . transport . . . any goods, articles, materials, or commodities . . . where an object thereof is— . . . (2) forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of Section 159 of this title; . . . (b) whoever shall be injured in his business or property by reason of any violation of subsection (a) of this section may sue therefor in any district court of the United States . . . or in any other court having jurisdiction of the parties and shall recover the damages by him sustained and the cost of the suit." (Note: Section 187(a) seems to have been amended effective September 14, 1959, a date subsequent to the conduct complained of.)

The right to maintain the action and the jurisdiction of the State court to hear it arise by congressional grant. In fixing the rights and liabilities of the parties, the Superior Court on the trial, and this Court on appeal, must accept the interpretation the Supreme Court of the United States has placed upon the Acts of Congress here involved. Constitution of the United States, Article VI, Section 2; Constitution of North Carolina, Article I, Sections 3 and 5; *State v. Davis,* 253 N.C. 86, 116 S.E. 2d 365; *Constantian v. Anson County,* 244 N.C. 221, 93 S.E. 2d 163; *Norris v. Telegraph Co.,* 174 N.C. 92, 93 S.E. 465.

Three basic questions are presented by the assignments of error: (1) The liability of International for the damages which proximately resulted from the strike. (2) Sufficiency of the evidence of actual damages to support the jury's finding. (3) Sufficiency of the pleadings and evidence to support an award of punitive damages. Discussion of these questions will necessarily involve the challenged portions of the court's charge with respect to them.

Its constitution states: The International Brotherhood of Teamsters, etc., shall consist of an unlimited number of local unions chartered by International. The stated purpose is "To organize under one banner all workmen engaged in the craft, and to educate them to cooperate in every movement which tends to benefit the organization. . . . This organization has jurisdiction over all teamsters, chauffeurs, warehousemen and helpers; all who are employed on or around . . . automobiles, trucks, trailers, and all other vehicles hauling, carrying or conveying freight, merchandise, or materials." So complete is International's control over local unions that it may suspend the local charter and place the locals in trusteeship under the direct supervision

of International's president. Indeed, even in this case, two of the locals, No. 55 and No. 391, involved in this strike, were in trusteeship, operating under the direct authority of James R. Hoffa, International President.

The evidence shows an agent of the union sent out "hot cargo" letters and addressed members of locals, particularly employed by Roadway Express, requesting them not to handle exchange freight for Overnite. The contribution to the expenses of maintaining the strike made by International, the active participation of its Locals Nos. 55 and 391, under trusteeship, and by its Joint Council No. 9, sufficiently show that International was using the locals as its hands and arms to carry on the strike throughout the area according to plans which originated in its own head. *N.L.R.B. v. International Brotherhood of Teamsters,* 267 Fed. 2d 870, *Certiorari* denied, 361 U.S. 914, Rehearing denied, 361 U.S. 945; *Dairy Distributors, Inc. v. International Brotherhood of Teamsters,* 8 Utah 2d 124, 329 P. 2d 414, *Certiorari* denied, 360 U.S. 909; *United Mine Workers of America v. Patton,* 211 Fed. 2d 742, *Certiorari denied,* 348 U.S. 824.

The evidence offered at the trial sufficiently established a principal-agency relationship between International and its local unions in fomenting the strike in order to force plaintiff, an unorganized freight carrier, to enter into an employment contract with the union. There is not a suggestion that the union had been designated or certified as a proper bargaining agent for plaintiff's employees. With respect to the principal-agency relationship, Judge Pless charged the jury:

"Now, then, coming to the first issue: Was the plaintiff, referring to Overnite Transportation Company, damaged by the wrongful acts of the defendant, as alleged in the Complaint? Now, that issue, ladies and gentlemen, will depend upon several factors. In the first place, the defendant, and you will remember that there is nobody here as party to this case except International Brotherhood which I have referred to as the union in the charge, is the only defendant, and it could be held responsible for what was done by others only in the event this was done in law as agent of the union. . . . To give you what is meant by agency, it is the relation which results where one party called the 'principal' authorizes another party, called an 'agent' to act for him or it. The relationship of principal and agent may be created by word of mouth, writing or implied, by consent or acquiescence. A servant is an agent of his master, to deal more generally with things rather than with persons. The distinguishing difference between an agent and servant is that an agent can

contract for his principal and bind his principal contractually, whereas a servant cannot so bind in contract his master. Both principal and master are liable for the torts of their agents and servants when acting in the scope of their employment.

"A person is responsible for not only his own acts, but for the acts of his employees or his agent when they are done within the scope of their employment and in furtherance of the business which is entrusted to them. The test of the liability, in all cases, depends upon the question whether the injury was committed by the authority of the master, expressly conferred or fairly implied from the nature of the employment and the duties incident to it. The simple test is whether they were acts within the scope of his employment, not whether they were done while prosecuting the master's business, but whether they were done by the servant in furtherance thereof, and were such as may fairly be said to have been authorized by him."

The parol testimony and the exhibits, interpreted in the light of International's constitution, clearly indicate the cords which joined the many locals together in the strike effort, binding them to act in close concert throughout the four states, were manipulated by International. The evidence was sufficient to warrant the jury in finding the plaintiff was damaged by defendant's wrongful acts.

The second question presents a somewhat more difficult problem. For proof of its actual damages, Overnite relied upon the testimony of its vice president and general manager and accounting supervisor, Mr. P. S. Simmons. After completing business college training and a course in financing, he became bookkeeper and cashier of Motor Transit Company, Raleigh. He was appointed terminal manager and then traffic manager dealing with cost analysis.

Upon returning from service he accepted employment by the North Carolina Utilities Commission and traveled throughout the State instructing motor carriers as to the method of keeping records, checking costs, and making the reports required by the Commission. He testified before the Commission in matters involving rates, etc. In 1951 he became assistant traffic manager for Overnite. "In addition to our own company's expense items and accounts in detail, I study and analyze, and compare with our own, rates reported of other carriers, . . . this information being obtained through . . . reports on file in the I.C.C. and various State commissions. . . . This is the kind of thing I deal in all the time. . . . I testified in various finance cases before the I.C.C. and the State Commissions. . . . 60 or 70 times."

The evidence was sufficient to support the court's finding the wit-

ness was an expert in cost accounting. With respect to the weight to be given his testimony, Judge Pless instructed the jury:

"Ladies and Gentlemen of the jury, in holding Mr. Simmons to be an expert in the field of cost analyses, the court does not mean by that, that you are bound by his testimony, nor should you give it any more credit than you would any other witness that appeared to be qualified, that is, it permits him to analyze and to some extent synopsize figures that would otherwise take a great deal of time. Of course, in that field, he is also permitted to express opinions that he would not be permitted to express were he not held to be an expert. However, none of these things are binding upon you, you would treat him just as you would any other witness, to determine whether or not it is acceptable to you. The objection is overruled."

Mr. Simmons testified he kept a daily record of the costs of the strike to his company. He gave the gross revenue each year beginning in 1955 as $5,843,530.00, which had increased to $12,000,000.00 in 1959. In 1958 the profit return was 9.2 per cent. In 1959 it was 3.11 per cent. The witness did not have in court the original records. He examined the records in 33 terminals operated by Overnite during 1959. Synopsis sheets made by him or under his direction, gave composite of the original records. In summary he testified the following losses resulted from the strike: Excess labor costs, $232,837.00; guards, $16,662.00; loss and damage to freight, $51,759.00; extra telephone and communications expense, $2,116.00; operating additional tractor-trailers, $20,170.00. The witness did not make a calculation showing the loss of profits during the term of the strike. However, counsel in the argument used the percentage of the net income fall-off during the strike which showed the loss to be $59,819.00. The jury accepted the evidence, including the calculation, and fixed plaintiff's actual damages at $363,193.00.

The one debatable item in the recovery is the loss of profits. "If a regular and established business is wrongfully interrupted, the damage thereto can be shown by proving the usual profits for a reasonable time anterior to the wrong complained of. . . . in a case of this kind it is open to the plaintiff to show a loss of profit upon the issue of injury and damage to his business, if he is able to present evidence from which the jury may be able to draw a reasonably accurate conclusion, not based on conjecture or speculation, as to the extent of the injury inflicted and amount of damage caused." *Steffan v. Meiselman,* 223 N.C. 154, 25 S.E. 2d 626.

On the issue of actual damages, Judge Pless charged:

"I instruct you further that such actual damages, if any, allegedly sustained by the plaintiff must be proven with reasonable certainty, although it is not required that such actual damages be proven with mathematical exactness or with absolute certainty unless the damages are such as are susceptible of definite or precise proof. However, in no event may an award of damages be based on conjecture, speculation or guess.

"In your consideration of what actual damages, if any, were sustained by the plaintiff in this case, you are not authorized to presume any such damages or base your decision thereon on guesswork or speculation, but you must look to the evidence as introduced in the trial of this case and determine whether a preponderance of the evidence shows, with reasonable certainty, that plaintiff, in fact, sustained any actual damages, and if so, you must then determine whether the evidence shows, with reasonable certainty, that any definite sum of such damages was sustained by the plaintiff.

"Recovery for the loss of future profits may be had where they are reasonably certain in character and are the proximate result of the tort. The proof must pass the realm of conjecture, speculation, or opinion not founded on facts, and must consist of actual facts from which a reasonably accurate conclusion regarding the cause and the amount of the loss can be logically and rationally drawn."

The plaintiff's evidence made out a case for the jury on actual damages. It was sufficient to support the amount fixed.

Under the Labor Management Relations Act of Congress, recovery is authorized "for the damages sustained and the cost of the suit." Damages sustained are limited to actual damages suffered as a result of the wrong inflicted. *United Mine Workers v. Patton,* 211 Fed. 2d 742. Punitive damages are never awarded as compensation. They are awarded above and beyond actual damages, as a punishment for the defendant's intentional wrong. They are given to the plaintiff in a proper case, not because they are due, but because of the opportunity the case affords the court to inflict punishment for conduct intentionally wrongful.

The plaintiff has stated one cause of action and only one. It does not allege a breach of the peace. It does not allege violence. So far as the evidence discloses, the picketing and the refusal to handle exchange cargo were peaceful. The cause of action arose by reason of the defendant's unlawful activities and demands for a contract without its prior designation as the bargaining agent for the plaintiff's

employees. In this particular field, the Federal authority is exclusive.

Admittedly, where a cause of action is asserted for a tort involving violence under State law and is coupled with a cause of action for violation of the Labor Management Relations Act, the State court may proceed to hear and determine both causes. The court may award punitive damages if authorized by State law in the case involving the State tort, but actual damages only may be awarded in the cause of action under the Labor Management Relations Act. The Federal courts recognize the right of the State court in a proper case to award punitive damages for a tort committed in violation of a right the State has recognized under its police power, although it is coupled with a separate Federal right, the jurisdiction over which is given to the State court by Congress. The joinder is permitted because the Act of Congress does not forbid it. *San Diego Trade Council v. Garmon,* 359 U.S. 236; *United Automobile Workers v. Russell,* 356 U.S. 634.

In the *Garmon* case the Supreme Court of the United States used this significant language: "It is true that we have allowed the States to grant compensation for the consequences as defined by the traditional law of torts, of conduct marked by violence and imminent threats to the public order. *United Automobile Workers v. Russell,* 356 U.S. 634; *United Construction Workers v. Laburnum Corp.,* 347 U.S. 656. . . . State jurisdiction has prevailed in these situations because the compelling state interest, in the scheme of our Federalism, in the maintenance of domestic peace is not overridden in the absence of clearly expressed congressional direction." (Citing *International Union v. Wisconsin Board,* 336 U.S. 245.) In cases where punitive damages have been allowed, a cause of action under State law was alleged, founded on violence, threats of violence, and intimidation. *United Mine Workers v. Osborne Mining Co., Inc.,* 279 Fed. 2d 716, *Certiorari* denied, 364 U.S. 881; *Youngdahl v. Rainfair, Inc.,* 355 U.S. 131; *Automobile Workers v. Wisconsin Employer Relations Board,* 351 U.S. 266.

In this case the plaintiff's complaint fails to state any separate cause of action under State law based on violence. In view of the authorities here quoted, and others of like import, we conclude the plaintiff's pleadings and evidence are insufficient to support an issue for punitive damages. Consequently the defendant's prayer for instructions should have been given. The exception based on its denial is sustained. The award of punitive damages is without a proper foundation and is stricken from the judgment. The record, however, does not disclose error in the award of actual damages.

As to Actual Damages — No error.

As to Punitive Damages — Reversed.