JOCIE MOTOR LINES, INC., PLAINTIFF v. INTERNATIONAL BROTHER-
HOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND
HELPERS OF AMERICA, DEFENDANT AND THE NEW DIXIE LINES,
INCORPORATED, PLAINTIFF v. INTERNATIONAL BROTHERHOOD
OF TEAMSTERS CHAUFFEURS, WAREHOUSEMEN AND HELP-
ERS OF AMERICA, DEFENDANT.

(Filed 16 October 1963.)

**1. Master and Servant § 16—**

In this action against an international labor union to recover damages
resulting from an unlawful secondary boycott to compel plaintiff employer
to recognize as a bargaining agent a labor union which had not been cer-
tified by any authority as a bargaining agent, the evidence considered
in the light most favorable to plaintiff *is held* sufficient to be submitted
to the jury upon the theory that the local unions and labor councils
were the agents of the international union in committing the unlawful
acts, and that the activities of the union pickets amounted to an un-
lawful secondary boycott in violation of § 303(a) of the Labor Man-
agement Relations Act.

**2. Evidence § 31;   Principal and Agent § 4—   Testimony held incom-
petent as hearsay and as tending to prove agency by declarations of
the agent.**

In an action against an international union to recover damages result-
ing from an unlawful secondary boycott carried on by a local union as
its agent, testimony of admissions by an officer of the local union made
in proceedings to which the international union was not a party, which
admissions were to the effect that the local union was reimbursed by the
labor union's joint council to the extent of payments to the pickets carry-
ing on the unlawful activities and that the joint council was reimbursed
in part by the international union, *held* incompetent as hearsay and as
tending to prove the fact of agency by declarations of the alleged agent,
there being no evidence that the officer of the local union was an officer
or agent of the international union.

**3. Trial § 17—**

The general admission of evidence competent for a restricted purpose,
or competent in part, will not be held for error unless appellant, at the
time of his admission, requests that its admission be restricted. Rule of
Practice in the Supreme Court No. 21.

**4. Evidence § 28—**

In an action against a labor union to recover damages resulting from
an unlawful secondary boycott, the admission in evidence of certain letters
of officials of the local and international union, competent only upon the
question of whether the local union was under control of the international
union, and a news release, competent in part in stating admitted facts,
will not be held for prejudicial error in the absence of a request at the
time they were offered in evidence that their admission be restricted.

Parker and Higgins, JJ., dissent.

APPEAL by defendant from *Froneberger, J.,* September 10, 1962, Schedule "A" Regular Civil Term of MECKLENBURG, docketed and argued as No. 248 at Spring Term 1963.

On May 3, 1960, Jocie Motor Lines, Inc., hereafter called Jocie, and The New Dixie Lines, Inc., hereafter called New Dixie, instituted separate civil actions against International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, an unincorporated labor organization or union, hereafter called defendant or International Union.

The original complaint in each action, after allegations relating to the identity and corporate status of plaintiff and the identity of defendant, was as follows:

"(4) That the plaintiff derived its revenues and profits from handling and transportation of direct freight, which is freight transported from origin to destination entirely by the plaintiff, and from handling and transportation of interchange freight which is freight not transported from origin to destination entirely by the plaintiff, but interchanged between the plaintiff and other trucking companies and transported part of the way from origin to destination by plaintiff and part of the way by such other interchange trucking companies.

"(5) That during the months of May, June, July and August of 1959, the defendant induced and encouraged the employees of the plaintiff's customers and the employees of the aforesaid trucking companies doing interchange freight business with the plaintiff to engage in a concerted refusal in the course of their employment, to transport or otherwise handle any goods, articles, materials or commodities going to or coming from the plaintiff and that the object of such inducement and encouragement of the employees of the plaintiff's customers and said employees of said trucking companies was to force and require the said customers and trucking companies to cease doing business with the plaintiff.

"(6) That such action on the part of the defendant was wrongful and in violation of law and was taken by the defendant for the willful, deliberate and malicious purpose of injuring and damaging the plaintiff; that as a result of such action on the part of the defendant the plaintiff has been shut off from and deprived of freight business which otherwise and normally the plaintiff would have profitably handled and has been required to pay out large sums of money for extraordinary expenses incurred by the plaintiff in its efforts to secure, handle and transport freight shipments and otherwise operate its business despite the wrongful and unlawful acts of the defendant herein-

above set forth and that in this manner and by this means the plaintiff has been grievously injured and damaged by the defendant.

"(7) That by reason of the matters hereinabove set forth, the plaintiff has been injured and damaged by the defendant in the sum of One Hundred Twenty-five Thousand Dollars ($125,000) and is entitled to judgment against the defendant in that amount, and by reason of the defendant deliberately, willfully and maliciously inflicting such damage upon the plaintiff as hereinabove set forth, the plaintiff is entitled to judgment for punitive damages against the defendant in an additional sum of One Hundred Twenty-five Thousand Dollars ($125,000).

"(8) That the acts of the plaintiff in the operation of its business described above affects interstate commerce within the meaning of the Labor Management Relations Act (29 U.S.C. 151, *et seq.*) ; and that jurisdiction of this cause is conferred upon this Court by Section 303(b) of said Act (29 USC 137b *(sic)* )

"WHEREFORE, the plaintiff prays judgment against the defendant in the sum of Two Hundred Fifty Thousand Dollars ($250,000), together with the costs of this action; and the plaintiff prays the Court for such other and further relief as the Court may deem just and proper."

In each action, defendant, answering, denied plaintiff's said allegations and prayed "that it be hence discharged."

Pursuant to orders dated January 19, 1962, each plaintiff amended its original complaint by adding immediately after paragraph (5) the following:

"(5a) That in addition to the defendant's illegal secondary boycotting activities, the Defendant resorted to assaults, assaults with deadly weapons upon, and damage to the property of, the plaintiff, its employees and persons seeking to do business with the plaintiff."

Defendant, in apt time, objected and excepted to said orders of January 19, 1962.

Before answering said "Amendment to Complaint," defendant, in each action, filed a "Demurrer and Motion to Strike of Defendant," asserting as grounds therefore the following:

"1. Said complaint seeks to recover under color of the Labor-Management Relations Act 1947 (29 U.S.C.A. sec. 151 and particularly under Sec. 29 U.S.C. 137 (b) *(sic)* ) punitive damages against this defendant which punitive damages are unauthorized under the foregoing statute and are not recoverable as a matter of law. Accordingly

said punitive damage count and each and every allegation therein contained including the allegations respecting defendant's alleged resort to assaults should be stricken from the face of the complaint as amended.

"2. Defendant demurs specifically to the amended complaint which purports to join in a Federal statutory proceeding a common law cause of action for unlawful trespass contrary to the terms of Section 1-127 of the General Statutes of North Carolina prohibiting misjoinder of causes of actions."

Defendant's said demurrer(s) and motion(s) to strike were overruled by order(s) dated March 30, 1962, and defendant excepted.

Thereafter, defendant, in each action, answered the amendment to complaint filed by plaintiff pursuant to said orders of January 19, 1962, as follows:

"(1) That the Defendant lacks knowledge and information sufficient as to form a belief as to the allegations in paragraph 5(a) of the Complaint as Amended and, therefore, denies the same.

"AND AS A FURTHER ANSWER AND DEFENSE, the Defendant alleges and says:

"(2) That if the alleged conduct attributed to the defendant in paragraph 5(a) of the Complaint as Amended did occur, which is denied as hereinabove stated, the said conduct occurred more than one year next preceding the filing of said Amended Complaint, as shown on the face thereof, and is barred by the Statute of Limitations respecting assault and battery actions, G.S. 1-54, which defense is specifically pled.

"(3) That the defendant did not authorize, ratify or participate in any action against the plaintiff, including that action complained of in the Amended Complaint.

"(4) That the plaintiff's controversy was with a local labor organization and not with this defendant; and that prior to the filing of this action, the plaintiff has instituted administrative proceedings against said local labor organization before the National Labor Relations Board dealing with the same subject matter as is involved in this action; and that the plaintiff has never instituted administrative proceedings against this defendant and has never charged this defendant with any misconduct whatsoever before the National Labor Relations Board.

"Except as herein modified, the Defendant adopts and ratifies its original Answer as if herein set out.

"WHEREFORE, having fully answered the Amended Complaint, the defendant renews its prayer that the plaintiff's action be dismissed, that the cost of this action be taxed to the plaintiff, and that the defendant receive such other and further relief to which it may be entitled in the premises; and further prays that the cause of action set forth in the Amended Complaint be dismissed with prejudice to the plaintiff."

At trial, for reasons that will appear from the summary of facts, the actions, by stipulation, were consolidated for trial and the two plaintiffs, collectively, were considered and treated as a single entity and referred to as "plaintiff."

Much testimony and documentary evidence was offered by plaintiff and by defendant.

Uncontradicted evidence tends to show:

In 1957, New Dixie, a Virginia corporation, and Jocie, a North Carolina corporation, were common carriers of general commodity freight in interstate and intrastate commerce. New Dixie, with headquarters in Richmond, was authorized to operate and did operate in Virginia, North Carolina and South Carolina. Jocie, with headquarters in Charlotte, was authorized to operate and did operate in North Carolina, South Carolina and Georgia.

In May, 1957, New Dixie entered into a contract, subject to I.C.C. approval, to purchase the corporate stock of Jocie; and, pending final decision on its application for approval, the I.C.C. in June, 1957, granted New Dixie temporary authority to manage and control Jocie's affairs. The sale was approved in May of 1959 and completed immediately. Thereafter, application was filed for New Dixie to take over the operating properties and franchises of Jocie. Pursuant to approval, this transfer was completed January 1, 1960. Hence, when these actions were commenced, New Dixie was the sole party in interest.

After June, 1957, New Dixie-Jocie operated as an integrated system. Of their fourteen terminals, the major terminals were those in Richmond, Charlotte and Atlanta. At the New Dixie-Jocie terminal in Charlotte, about twenty were employees of Jocie and about seventy were employees of New Dixie.

New Dixie had no labor contract and was nonunion. Jocie had a contract with Local 71 (Charlotte), with Local 728 (Atlanta) and with Local 391 (Greensboro). Jocie was a party to area-wide union contracts covering its Greensboro, Charlotte and Atlanta terminals. It was also a party to a Southern Conference Local Freight Forwarding,

Pickup and Delivery Agreement. These agreements covered approximately one hundred employees.

There was evidence tending to show:

In the first week of May, 1959, the president of Local 509 (Columbia) made demand that it be recognized as bargaining agent for Jocie's Charleston employees. No National Labor Relations Board election had been held or requested. On the morning of May 18th, union pickets were stationed in front of Jocie's Atlanta terminal. When advised of this picket line, J. D. Brothers, President of New Dixie, flew from Richmond to Atlanta. In a telephone conversation with Brothers, Guy O. Alexander, Business Manager of Local 71, demanded that the union be recognized as bargaining agent for New Dixie employees and threatened, upon refusal of said demand, to shut plaintiff down. Alexander spurned Brothers' suggestion that the union petition for a National Labor Relations Board election among its employees. Late in the afternoon of May 18th, union pickets were stationed at the New Dixie-Jocie terminal in Charlotte.

At the outset, picketing was confined to plaintiff's terminals. Despite this picketing, plaintiff's business continued to operate. Upon instructions issued by officers of local unions, pickets then began to follow plaintiff's trucks to the points of pickup and delivery at the premises of plaintiff's customers and interchange carriers, principally in or near Charlotte and Atlanta.

Picket lines were maintained at the entrances to the premises of plaintiff's customers and interchange carriers when plaintiff's trucks were there. Before setting up picket lines at the premises of secondary employers, the pickets would go to the warehouses of such employers, ask someone in charge, or if no one was in charge, anyone there, to get the employees of such employers not to handle plaintiff's freight or to sit down and stop work completely while the picket line was up and, further, to get employees of other companies not to cross the picket lines. The object of such roving pickets was to stop the flow of freight being delivered by or to the plaintiff.

While this picketing was in progress, employees of numerous customers and interchange carriers refused to handle plaintiff's freight or cross the roving picket lines and in many cases refused to do any work so long as the picket lines were present.

The pickets wrote down the names of union members who crossed the roving picket lines. This was done openly in the presence of the offending member. The names of these individuals were turned over to Hargett (President of Local Union No. 71) who, in turn, prosecuted them before Lloyd Young, President of Carolina Joint Council No. 9.

Those found guilty of crossing the roving picket lines were fined by Young.

Plaintiff continued to operate during May, June, July and August of 1959 (and thereafter) despite acts of violence committed by union pickets and unidentified persons. The acts of violence, with one exception, occurred at plaintiff's terminals or along the road rather than at the places of business of plaintiff's customers or interchange carriers. These acts of violence consisted of damage to certain of plaintiff's equipment and assaults or threatened assaults on persons (plaintiff's employees) operating plaintiff's equipment. Property damage was sustained. There were no personal injuries.

Large numbers of customers completely stopped doing business with plaintiff. Others greatly curtailed business dealings with plaintiff. Still others continued to use plaintiff's services, but only when plaintiff did all the work of handling its freight whereas, prior to the strike, they had assisted plaintiff's employees in loading, unloading and checking such freight. Local cartage agents were employed by plaintiff to pick up and deliver freight of customers who were willing to use plaintiff's services, but who were unwilling to do so at the risk of business interruptions caused by roving pickets. Extra employees were hired and additional equipment was leased to take care of freight where employees of neutral companies refused to handle it. Administrative and supervisory employees were transferred from their regular duties to handling freight, reassuring customers and other jobs related to moving freight, notwithstanding the pickets' activities. Guards were hired to protect the property of plaintiff and its employees. Damage claims were excessive due to the necessity of double handling of freight.

Additional facts will be stated in the opinion.

Defendant, in apt time, moved for judgment of involuntary nonsuit and excepted to the court's denial thereof.

Defendant tendered, and excepted to the court's refusal to submit, this special issue: "Were the local unions or persons who engaged in the picketing alleged to be illegal in this case then acting as agents of the defendant International Union?"

The court submitted, and the jury answered, the following issues:

"1. Was the Plaintiff damaged by the wrongful actions of the Defendant, as alleged in the Complaint? ANSWER: Yes.

"2. If so, what amount, if any, is the Plaintiff entitled to recover of the Defendant as actual damages? ANSWER: $104,023.11.

"3. Was Plaintiff damaged by the violent, reckless, wanton and malicious actions of the defendant, as alleged in the Complaint? ANSWER: Yes.

"4. How much, if any, is Plaintiff entitled to recover of Defendant as punitive damages? ANSWER: $120,000."

In accordance with the verdict, the court entered judgment "that the plaintiff have and recover of the defendant $104,023.11 actual damages, together with $120,000.00 punitive damages, and the costs of this action to be taxed by the Clerk."

Defendant excepted, appealed and brings forward numerous assignments of error.

*Blakeney, Alexander & Machen for plaintiff appellee.*

*Francis M. Fletcher, Jr., Herbert S. Thatcher and McLellan & Wright for defendant appellant..*

Bobbitt, J.  Defendant assigns as error the denial of its motion for judgment of involuntary nonsuit. In passing upon this assignment, it is necessary to consider the nature of the cause of action alleged and the theory of the trial.

Plaintiff, in express terms, based its action on Section 303(b) of the Labor Management Relations Act, 61 Stat. 159, 29 U.S.C.A. § 187(b), which provides:

"Whoever shall be injured in his business or property by reason or (of) any violation of subsection (a) may sue therefor in any district court of the United States subject to the limitations and provisions of section 301 hereof without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit."

In May, June, July and August, 1959 (and prior to amendment of September 14, 1959), the pertinent portion of Section 303(a), 61 Stat. 158-159, 29 U.S.C.A. § 187(a), provided:

"(a) It shall be unlawful, for the purposes of this section only, in an industry or activity affecting commerce, for any labor organization to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is—

"(1) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other per-

son to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person;

"(2) forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 9 of the National Labor Relations Act."

It is noted that plaintiff, in paragraph 5 of the complaint, uses substantially the language used in said Section 303(a).

The federal statutes to which reference will be made are the "National Labor Relations Act" of 1935, 49 Stat. 449 *et seq.*, as amended by the "Labor Management Relations Act, 1947," 61 Stat. 136 *et seq.* Provisions of the 1947 Act are codified as follows: § 7 is 29 U.S.C. § 157; § 8 is 29 U.S.C. § 158; § 303 is 29 U.S.C. § 187; § 301 is 29 U.S.C. § 185.

The complaint contains no reference to a strike. Nor does it refer to Local 509 (Columbia) or Local 71 (Charlotte) or to any other subordinate or affiliate of the International Union. It alleges the International Union committed the alleged unlawful acts without designating the agency through which it acted.

The following excerpts from the court's charge indicate the theory of the trial:

"As you have learned from the evidence in this case, Locals 509 and 71, local unions affiliated with the defendant International Union who were actively carrying on the strike and picketing against the plaintiffs, are not parties to these proceedings, nor were the Joint Council Nine or the Eastern or Southern Conferences, also affiliated with the defendant. The defendant International Union alone has been sued on the theory that it was the principal for whom Locals 71 and 509 were acting as agents within the scope of their authority at the time of the events out of which this lawsuit arose. Whether the facts support this theory is an issue that you must decide, as plaintiff's contentions in this respect are expressly denied by the defendant.

"Under the law the defendant International Union, on the one hand, and its subordinate affiliated bodies such as local unions, joint councils and conferences, on the other hand, are considered separate and distinct entities. The mere fact that a local union or other subordinate bodies are constituent bodies or entities embraced within or affiliated with the International Union does not of itself make the local union or other subordinate bodies the agent of the International Union, nor does this

fact of affiliation make this International Union responsible for such acts of the local unions or other subordinate bodies.

"To hold the Defendant responsible for the actions of said local unions, you must find either that defendant itself participated in such actions or that the local unions were acting as the agents of the defendant."

Whether plaintiff was damaged by unlawful secondary boycott activities of the union pickets, and, if so, whether those engaged in such activities were acting as agents of International Union were the questions involved in the first issue.

The court's final instruction with reference to the first issue was as follows: "Now . . . if the plaintiff . . . has satisfied you . . . by the greater weight of the evidence that in failing to handle the cargo of the plaintiff's transportation company, that members of the union were acting not as individuals but in concerted actions for and on behalf of the Union as its agent, that the union would become responsible for their action; and if it has not so satisfied you, then it would be not responsible. Therefore, if you find that the members of the union were not acting as individuals and that they engaged in secondary boycotting, if you find from the evidence and by the greater weight of the evidence, then it would be your duty to answer that first issue yes. If you are not satisfied, Ladies and Gentlemen of the Jury, if you are not satisfied, then it would be your duty to answer that issue no."

International Union did not except to the last quoted excerpt. We are not now concerned with whether it is insufficient or erroneous.

The relationships between the International Union, the conferences, the joint councils and the (approximately 960) locals are set forth in the constitution of the International Union. Excerpts therefrom are quoted by *Higgins, J.,* in *Transportation Co. v. Brotherhood,* 257 N.C. 18, 125 S.E. 2d 277, *certiorari* denied *sub nom. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Petitioner v. Overnite Transportation Co.,* 371 U.S. 862, petition for rehearing denied, 371 U.S. 899. In *International Bro. of Teamsters, etc. v. United States,* 4 Cir., 275 F. 2d 610, Haynsworth, Circuit Judge, summarizes the provisions bearing upon the International Union's right of control over a local union. We approve Judge Haynsworth's summary and agree with the court's conclusion, *viz.*: "It (the constitution) showed such extensive control and direction of the local as to warrant the conclusion that the local is a component of the International. The local is the internal organizational means which the International employs to keep its accounts of its membership, to collect its revenues, and to execute and enforce its policies. If all of the

other general and specific rights of control vested in International should prove insufficient to assure subservience of a local in a particular matter, the right to suspend the charter and seize immediate control of a local which adopts an independent course must be effective."

As to whether International Union exercised its right of control, the evidence is in conflict; but, when considered in the light most favorable to plaintiff, we think it was sufficient to support findings that International Union authorized the strike and supported it by direct payment of strike benefits to Local 71 (Charlotte) pickets and by indirect payment of strike benefits to Local 728 (Atlanta) pickets, and that International Union was fully advised of the secondary boycott activities being employed as a means of obtaining the objectives of the strike.

International Union contends, citing *Labor Board v. Rice Milling Co.,* 341 U.S. 665, 95 L. Ed. 1277, 71 S. Ct. 961, and other decisions, that the evidence fails to disclose secondary boycott activities in violation of Section 303(a). In our view, the evidence, when considered in the light most favorable to plaintiff, was sufficient to support findings that the activities of union pickets at the places of business of plaintiff's customers and interchange carriers *induced* and *encouraged* the employees of such secondary employers by *concerted* action to refuse to handle commodities transported by plaintiff.

International Union's assignment of error directed to the court's denial of its motion for judgment of involuntary nonsuit is overruled.

International Union assigns as error the admission by the court over its objection of the testimony referred to below.

The evidence that plaintiff was damaged by the secondary boycott activities of union pickets is plenary and uncontradicted. International union contended, and offered evidence tending to show, that it did not authorize the strike or picketing or secondary boycott activities; that, when plaintiff refused to reinstate union members who had gone on strike, such payments as International Union made were lockout benefits, not strike benefits; and that, in calling the strike and in picketing and in the secondary boycott activities, the local unions acted as autonomous unions and not as agents of International Union.

There is evidence that plaintiff "got an injunction in the Federal Court around August 20, 1959." Apparently, the roving or ambulatory picketing and secondary boycott activities were then enjoined but picketing at plaintiff's terminals was permitted to continue and did continue.

International Union assigns as error the admission, over its objection, (1) of certain testimony of J. D. Brothers, New Dixie's President,

as to what R. C. Cook, President of Local 728 (Atlanta), testified at a National Labor Relations Board hearing in Atlanta, and (2) of a portion of the official report of said hearing, consisting of testimony given by Cook at said hearing. The said record indicates the hearing was held October 29, 1959, in a proceeding to which Local 509, Local 728 and Jocie (but not International Union) were parties. The exact nature and purpose of the hearing does not appear.

Brothers testified that he, personally, cross-examined Cook at said National Labor Relations Board hearing. Brothers was permitted to testify, over objection by International Union, as follows: "Mr. Cook admitted under my cross-examination that he was reimbursed by Joint Council 9 for every, for all of the strike expenses, and in turn Joint Council 9 was partially reimbursed by the International." International Union moved to strike and for a mistrial and excepted to the denial of its said motions.

The portion of said official report offered and admitted in evidence tends to show that Local 728 made payments to Overnite and Jocie pickets; that, although not affiliated with Joint Council 9, Local 728 was reimbursed by Joint Council 9 to the extent of its payments to Jocie pickets; and that Joint Council 9 was reimbursed in part by International Union. Local 509 (Columbia) and Local 71 (Charlotte) were affiliated with Joint Council 9.

Cook was not a witness at the trial of this action.

Plaintiff suggests that this evidence was competent as a declaration against interest. Cook was testifying as President of Local 728, a party to the proceeding. Whether his declarations were against the interest of Cook or of Local 728 does not appear. There is no evidence that Cook was an officer of International Union. International Union was not a party to the proceeding and Cook was not testifying in its behalf. When his testimony was given, the alleged roving or ambulatory picketing and secondary boycott activities had been enjoined. It is noted that the statements attributed to Cook referred to what (may have) occurred in May, June, July and August of 1959.

There was independent evidence that Local 728 made payments to Jocie pickets, that Joint Council 9 made payments to Local 728 and that International Union made payments to Joint Council 9. But the evidence as to Cook's testimony at the National Labor Relations Board hearing is the only evidence that tends positively to identify payments made by International Union to Joint Council 9 as made to reimburse Local 728 in part for payments made by it to Jocie pickets. There can be no question as to the force and prejudicial effect of the testimony as to what Cook said October 29, 1959, at said National

Labor Relations Board Hearing. The evidence as to what Cook testified at said hearing was incompetent because (1) it was hearsay, and (2) agency may not be proved by the *declarations* of the alleged agent. The admission thereof is prejudicial error for which a new trial must be awarded.

International Union assigns as error the admission, over its objection, of four documents identified collectively as plaintiff's Exhibit 17, to wit:

"(1)   NEWS RELEASE
'For Immediate Release to all News Media
Greenville, South Carolina
February 1, 1962

### TEAMSTERS LOSE AGAIN

The Teamsters' organizers suffered another defeat in Greenville, South Carolina on February 1, 1962. In an election supervised by the National Labor Relations Board, the employees of the New Dixie Lines' terminal at Greenville rejected Teamsters Local 509 as their bargaining agent. Only one vote was cast in favor of the Union.

(This was the first election ever held in the New Dixie four state operation since this general commodity motor carrier began operations in 1945. New Dixie operates throughout Virginia, North Carolina, South Carolina, and Georgia from twenty-two terminal locations with an annual gross revenue exceeding $4,500,000.00.) (Our parentheses).

(This completes the latest chapter of Hoffa's Teamsters efforts to organize the employees of New Dixie.) (Our parentheses).

(In 1959 New Dixie and its subsidiary, Jocie Motor Lines, were involved in a prolonged and bitter struggle with the Teamsters. As a result New Dixie filed a $500,000.00 suit against Hoffa's International Union for damages alleged to have been inflicted as a result of unlawful secondary boycott activity and violence. This suit is scheduled for trial in the Superior Court of Charlotte, North Carolina on April 16, 1962.) (Our parentheses).

s/J. D. Brothers<br>President'

"(2) LETTER OF J. D. BROTHERS, PRESIDENT OF THE NEW DIXIE LINES, INC.
'THE NEW DIXIE LINES, INC.
NEW DIXIE
BROOK ROAD AND NORWOOD AVE., RICHMOND, VA.
P. O. BOX 5032, PHONE EL 5-9141

February 12, 1962

To all New Dixie Friends:

   Enclosed is a copy of a News Release made on February 1. I thought you might be interested in its contents.

                                      Very truly yours,
                                      NEW DIXIE LINES
                                      s/J. D. Brothers
                                      President

JDB/de
Att: News Release'

   "(3) LETTER OF D. S. WILLARD, PRESIDENT OF LOCAL UNION 391

                'CHAUFFEURS, TEAMSTERS & HELPERS
                        Local No. 391

                        Main Office
P. O. Box 873, Phone BRoadway 3-7389,
Greensboro, North Carolina

                        Sub-Office
P. O. Box 598, Phone PArk 5-7586
Winston-Salem, North Carolina

                Affiliated with
EASTERN CONFERENCE OF TEAMSTERS I. B. of T. C. W. & H. OF A.

                                 Affiliated with Carolina Joint
                                 Council No. 9
                                      February 15, 1962

Mr. James R. Hoffa, General President
International Brotherhood of Teamsters
25 Louisiana Avenue, N. W.
Washington 1, D. C.

Dear Sir and Brother:

   Enclosed herewith is photocopy of letter and News Release put out by the New Dixie Lines, Inc.

   This is being mailed to business concerns, as this was handed to one of Local 391 members by a customer that he was delivering at. This is for your information.

With best wishes, I am

Fraternally yours,
s/D. S. Willard, Pres.
Teamsters Local Union
No. 391

DSW:m
Encl. '

"(4) LETTER OF JAMES R. HOFFA, GENERAL PRESIDENT OF THE DEFENDANT INTERNATIONAL.

N L R B
CASE No. 11-cc-17
X New Dixie Lines
X
February 19, 1962

'Mr. Thomas E. Flynn, Area Director
Eastern Conference of Teamsters
100 Indiana Ave., N.W.
Washington, D. C.
Dear Sir and Brother:

The attached communication from D. S. Willard, President of Local Union 391 is self-explanatory.

From the looks of this I would say that it might be well to be sure of ourselves before we petition for elections. Please go to work on this and organize all of the employees and pull them out on strike if you can't win the election.

Fraternally yours,
James R. Hoffa
General President

JRH/yk
Enc. ' "

While the 1962 letters of Willard and Hoffa were not competent as evidence that Hoffa authorized, supported or ratified the strike, picketing and secondary boycott activities in May, June, July and August of 1959, they would appear competent for *a limited purpose*, that is, as bearing upon the question as to whether, as contended by International Union and as International Union's evidence tended to show, the locals in actual practice were autonomous and not subject to the direction and control of International Union. However, it does not

appear defendant requested the court to instruct the jury as to the *limited purpose* for which said 1962 letters were competent. Under Rule 21, Rules of Practice in the Supreme Court, 254 N.C. 783, 803, it is not a "ground of exception that evidence competent for some purposes, but not for all, is admitted generally, unless the appellant asks at the time of admission, that its purpose shall be restricted."

A portion of the "News Release" (through the first paragraph thereof) was admissible as explanatory of the subject referred to in said 1962 letters. The second, third and fourth paragraphs thereof (enclosed by our parentheses) are self-serving and are not competent for any purpose. However, it appears defendant's objection was directed to the "News Release" in its entirety rather than to specific portions thereof. In this connection, see *Grandy v. Walker,* 234 N.C. 734, 68 S.E. 2d 807, and *S. v. Brooks,* 260 N.C. 186, 188, 132 S.E. 2d 352.

While, under our rules, the admission of said 1962 letters and of said "News Release" over defendant's general objection would not ordinarily be ground for a new trial, the foregoing discussion with reference to the competency of this evidence seems appropriate.

We pass, without discussion, the questions raised by assignments of error directed (1) to the court's failure to submit the specific issue as to agency tendered by International Union and (2) to designated portions of the charge bearing upon the first issue. These questions may not recur at the next trial. Moreover, since a new trial is awarded, we do not discuss, upon the pleadings and evidence in the record now before us, whether the court erred in submitting the third and fourth issues or in the instructions given the jury with reference thereto.

New trial.

Parker & Higgins, JJ., dissent.