The CELOTEX CORPORATION

v.

UNITED STEELWORKERS OF AMER-
ICA and Local 12829, United Steel-
workers of America, AFL–CIO–CLC.

Civ. A. No. 70–1841.

United States District Court,
E. D. Pennsylvania.

Dec. 17, 1974.

Roland Morris, Philadelphia, Pa., for plaintiff.

Patrick J. O'Connor, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

The Celotex Corporation ("Celotex") commenced this action under § 301 of the Taft-Hartley Act, 29 U.S.C. § 185, against the International Union of District 50, Allied Technical Workers of the United States and Canada ("International") and Local 12829 ("Local"), to recover damages sustained as a result of the breach of a no-strike clause contained in the collective bargaining agreement entered into by the above-captioned parties.[1] The case proceeded to a bifurcated trial before a jury of eight. After the International and the Local were both found to have breached the collective bargaining agreement, the trial was reconvened on the issue of damages. At the close of testimony on damages,[2] the jury awarded the plaintiff $40,000 in total damages. Presently before the Court is the defendants' motion for a new trial on the issue of liability only. For reasons hereinafter stated, the motion will be denied.

## FACTUAL BACKGROUND

At all times material to this action Celotex owned and operated an industrial plant located at 36th Street and Grays Ferry Avenue, Philadelphia, Pennsylvania. The plant, which consisted primarily of two production departments known as the Felt Mill and the Roofing Mill, employed approximately 250 persons on an hourly basis and was engaged in the manufacturing of roofing materials. The roofing materials produced at the plant were sold on a regular basis to customers of Celotex.

The collective bargaining agreement between Celotex, the International, and the Local contained the following provision:

"During the period of this agreement, the Company agrees there will not be any lockout and the Union agrees that the Union will not authorize, call, support, sanction or approve any slowdown or stoppage of work in any form except in case of a refusal by the Company to comply with the grievance procedure set forth in Article V of this agreement."[3]

In accordance with established company practice, the Felt Mill was scheduled to be shut down beginning March 7, 1970, for a two-week annual maintenance overhaul. Because the Felt Mill provides the Roofing Mill with products and supplies used in the manufacturing of roofing materials, sufficient materials were inventoried so as to enable the Roofing Mill to operate throughout the planned maintenance and repair shutdown. During the overhaul period, only maintenance employees were scheduled to work in the Felt Mill. Production employees were temporarily transferred to other departments, took their vacations, or were laid off for a brief period of time. The major repair and maintenance work was to be done by independent contractors who had entered into fixed-price contracts with Celotex. The outside contractors had no connection with the plaintiff or the labor unions involved herein other than the contractual agreement to perform certain repair work on plant machinery. In order to complete the repairs and maintenance work provided for in the contract within the two-week period, the employees of the independent contractors were required to work overtime.

From March 5 to 11, inclusive, brief unauthorized walkouts of the mainte-

1. Prior to the trial of this case, the International Union of District 50 merged with the United Steelworkers of America. By stipulation of the parties, the caption was changed so as to reflect the United Steelworkers as a defendant.

2. The defendants presented no evidence on the question of damages.

3. All parties were in agreement that the above contract governed labor-management relations during the time in question. The agreement was in force from October 1, 1967, through September 30, 1970.

nance employees in the Felt Mill occurred. The evidence adduced at trial demonstrated that the apparent cause of the work stoppages was the dissatisfaction of the Felt Mill employees with the fact that the employees of the independent contractors were working overtime at the plant and the regular Celotex employees were not. The Celotex employees believed they were being unfairly deprived of the opportunity to work overtime because of the overtime work of the contractors. On March 12, 1970, a significant number of Celotex employees (members of the Local) engaged in another walkout to protest the lack of overtime. At approximately 11:00 a. m. on March 12, Albert D. Plusch, Assistant Regional Director of the International, and other union officials went to the office of the General Manager of the Celotex plant, Gerald L. Talbot, where an informal discussion of the overtime problem in the Felt Mill was held. What transpired at the meeting was the subject of much dispute at the trial. Plusch testified that he was advised by Talbot that there was a need for experienced maintenance men in the Felt Mill and that the Celotex employees could work "as much as sixteen hours a day." The plaintiff admitted that Talbot made the above statement, but contended at trial that the offer of overtime was conditioned on confirmation of actual need for extra work and the approval of Alfred Connor, the plant maintenance supervisor. In any event, Plusch left the office and promptly relayed his version of the overtime offer to the men who had walked off the job on the morning of March 12. The employees immediately went into the plant and began to work. However, at the close of the day shift on March 12, insufficient overtime was scheduled for the maintenance employees at the Felt Mill to satisfy employees at the Celotex plant.

At a regularly scheduled grievance meeting conducted the next day, at approximately 9:00 a. m., the overtime issue was again raised. Tempers flared and a heated discussion between union officials and management ensued concerning the failure of the company to provide the opportunity for overtime allegedly promised the previous day. Talbot attempted to explain to Plusch and the other Local officials present that overtime could not be assigned indiscriminately but that it would be given when needed and to those workers who possessed the requisite skills. The meeting ended abruptly. According to Talbot's testimony (introduced via the witness' deposition at p. 53), Plusch made the following statement in the presence of all those people who attended this meeting:

"If all of maintenance people aren't asked to work overtime tonight, then he [Plusch] acting for the union would sanction the people walking out, and I don't care if I don't have a job tomorrow."

Plusch denied making the above statement.

The 4:00 p. m. shift did not report to work on the afternoon of March 13. Following shifts also failed to report to work as scheduled. The evidence established that the unauthorized work stoppage continued from 4:00 p. m. on Friday, March 13, until Thursday, March 19, at which time the plaintiff secured an injunction from the Court of Common Pleas of Philadelphia County. The order issued by the State Court enjoined the Celotex employees from striking in violation of the "no-strike" clause. In light of scheduling and other related difficulties, the plaintiff decided not to begin full plant operations until Monday, March 23.

In addition to the statement allegedly made by Plusch at the conclusion of the March 13 meeting, plaintiff introduced evidence to show that, shortly after the inception of the March 13 work stoppage and throughout the unauthorized walkout, striking employees carried signs bearing the legend "District 50 on Strike" in and about the Celotex plant. Plaintiff contended that Plusch distributed the above-described strike signs to

the striking employees from the trunk of his car. Plusch testified that as he opened his trunk to fix a flat tire several employees reached in and grabbed the strike signs from the trunk.

The evidence introduced at trial also showed that a series of meetings and discussions were held by International representatives, Local officials, and union members between March 13 and 19. At one such meeting, a show-of-hands vote was taken to determine whether the Celotex employees desired to return to work. The employees voted against a return to work. The International claimed at trial that the men were repeatedly warned to return to work so that grievance and arbitration procedures could be initiated. Celotex's position was that the defendants failed to take reasonably available measures to effectuate the termination of the unauthorized work stoppage and the return to work by the employees.

■ Both sides agreed at the trial that the walkout and subsequent work stoppage constituted a violation of the collective bargaining agreement. At no time during the periods relevant to this action did the plaintiff refuse to comply with the grievance procedure outlined in the contract. The principal factual issue in the case was whether the International and/or the Local authorized, sanctioned, or approved the walkout. The jury resolved the issue in favor of the company. Viewing the evidence in the light most favorable to the plaintiff, the Court concludes that the finding of liability against both labor organizations was supported by substantial evidence and should not be disturbed. Rogers v. Hi-Way Dispatch, Inc., 463 F.2d 587 (7th Cir. 1972); Eberle Tanning Company v. United States, 342 F.Supp. 1039 (M.D.Pa.1972).

## DISCUSSION

Defendants have raised several legal arguments in support of the motion for a new trial. While we do not consider any of the contentions advanced by the defendants to be sufficient grounds for the granting of a new trial, limited discussion of the issues presented is appropriate.

■ The defendants claim initially that the Court erred in charging the jury that the failure of the labor organizations to use all reasonably available means to get the employees back to work could be considered in determining whether the defendants sanctioned, supported, or authorized the work stoppage which commenced on March 13, 1970. Article XIII(a) of the collective bargaining agreement provided explicitly that the union would not "authorize, call, support, sanction or approve any slowdown or stoppage of work in any form . . . ." The failure of the defendants to undertake whatever reasonable measures are available at the time in question to effect a return to work by the Celotex employees is certainly relevant to the principal issue of whether the labor organizations violated the above-stated contractual provision.[4] Implicit in the union's agreement not to sanction, approve, or support an unauthorized work stoppage is the obligation to take all reasonable and potentially productive measures to bring an end to the "wildcat" strike. Eazor Express, Inc. v. International Bro. of Team., etc., 357 F.Supp. 158 (W.D.Pa.1973). A complete failure to undertake affirmative action is inconsistent with the defendants' contractual obligation not to approve or sanction an unauthorized walkout, especially when International and Local officials are physically present at the plant, attend labor-management

---

4. The Court instructed the jury that they could conclude that the defendants utilized all available measures to terminate the unauthorized strike. With respect to the question of what means were available to the defendants, there was evidence in the case of Local officials not returning to work, the complete absence of any disciplinary proceedings and the failure of the International representatives to forcefully exhort the workers to return to work.

discussions, and conduct union membership meetings throughout the strike.

Furthermore, the union's responsibility to take reasonable measures to induce the employees to return to work is even stronger in those situations where the work stoppage has been provoked by the union officials themselves. In the case at bar, considerable evidence was introduced concerning Plusch's involvement in the unauthorized walkout. The plaintiff contended (and the jury apparently believed) that Plusch instigated the walkout by his statement at the close of the March 13 meeting and thereafter furnished his support as a high union official to the strike by distributing the "District 50 on Strike" signs to the Celotex employees gathered in and around the plant area. Under the facts and circumstances of this case, the failure of the defendants to take all reasonable and available means to terminate the unauthorized walkout could be considered by the jury in determining whether the defendants sanctioned, supported, or authorized the work stoppage. The charge of the Court in connection with such failure to act was, therefore, proper.

■ In further support of the motion for a new trial, the defendants contend that the trial court erred in not submitting to the jury the issue of whether the March 13 work stoppage was provoked by the plaintiff's own conduct.[5] The defendants argue that the evidence introduced at trial could have reasonably supported a finding by the jury that the company's breach of an alleged agreement by Plant Manager Talbot to provide more overtime was the proximate cause of the walkout on March 13, 1970.

The Court refused to charge the jury as requested by the defendant for several reasons. Primarily, the Court believed that the requested instruction would have been inconsistent with the proof adduced at trial and the collective bargaining agreement to which all of the parties were signatories. The principal thrust of the defense in this case was that the work stoppage was instigated by certain Celotex employees, namely, Martin and O'Donnell, and that the union officials in no way called or sanctioned the walkout. The defendants conceded that the failure of the Celotex employees to report to work as scheduled constituted an unauthorized work stoppage in violation of the collective bargaining agreement.[6] There being no real question that the employees did not initiate the grievance procedure expressly required by the labor agreement and engaged in an unauthorized strike, a jury instruction concerning the possible responsibility of the plaintiff for the walkout would have been improper, confusing, and unsupported by the evidence.

While the defendants did present testimony tending to show that Talbot breached his promise to provide Felt Mill maintenance employees more overtime, the precise reason why the employees failed to report to work was irrelevant. The uncontroverted evidence established that the refusal to work directly violated the collective bargaining agreement. As previously discussed, the labor agreement in question here provided that the union would not support or authorize a cessation of work unless the company refused to comply with the grievance procedure as set forth in Arti-

---

5. The following instruction was refused by the Court:

"9. In that regard, you have heard evidence of an agreement that was reached on March 12th between Albert Plusch and Gerald Talbot concerning the overtime question of maintenance employees in the felt mill. If you believe that the Company violated that agreement by not letting all of the men work overtime then your ver-

dict must be for the defendants. In other words, if you find that the work stoppage of March 13th was provoked by the plaintiff's own conduct, there is no liability on the part of the defendants." (Citations omitted.)

6. See, notes of testimony at pages 2–153, 2–155, 2–157, 3–54, 3–56, 3–70, 3–120, 3–121, 3–125, 3–174, and 3–241.

cle V of the contract. Despite the workers' dissatisfaction with the amount of overtime allotted, grievance procedures were not initiated. Celotex never had the opportunity to reject an arbitration request. To have submitted to the jury the question of whether the work stoppage was provoked by the company's conduct would have effectively nullified the grievance clause. Even if Talbot did breach the alleged agreement to provide additional overtime, the employees still had no right to strike under the terms of the labor contract. The grievance and arbitration procedures would be rendered meaningless if employees possessed the right to walk out in protest of action taken by management with respect to matters covered by the arbitration clause.

The interest in preserving industrial peace and economic stability compels a good faith compliance with the grievance and arbitration mechanisms outlined in the collective bargaining agreement. The fact that the company may have reneged on its promise to schedule more overtime is not an exception to the provisions of the grievance procedure and, accordingly, could not legitimize a work stoppage absent a refusal by the company to comply with that grievance procedure. In that the instruction requested by the defendant would have initiated the grievance-arbitration clause, it was properly refused by the Court.

Moreover, the Court specifically instructed the jury on the issue of proximate causation. The Court charged as follows:

" . . . Before you may render a verdict in favor of the plaintiff against either defendant, you must find that that defendant's acts, singly or in combination, were a proximate cause of the stoppage." (N.T. 4–32.)

■ The third argument advanced by the defendants in support of the motion for a new trial also involves the interpretation of a provision in the subject collective bargaining agreement. Article XIII, Subsection (c) of the agreement provides essentially that in determining whether any person is acting as an agent of the union so as to make the union responsible for the acts of such person, strict proof that the acts in question were actually authorized or subsequently ratified by the union is required. In other words, before either the International or the Local may properly be charged with violation of the instant agreement, the plaintiff must show that the acts allegedly committed by Al Plusch and/or other union officials were actually authorized or subsequently ratified by the defendants. The defendants contend that the Court's charge with respect to the issue of actual authority and the special interrogatory submitted to the jury in connection with the instruction on actual authority were contrary to the terms of the collective bargaining agreement and, therefore, erroneous.

The Court charged the jury as follows:

"Actual authority is authority that is expressly given together with authority that may not be expressly given but that is necessary to carry out the expressed authority." (N.T. 4–20.)

Special Interrogatory No. 3 embodied the above instruction, requiring the jury to determine whether any of the acts constituting an approval or support of the work stoppage were "expressly authorized, or did such acts necessarily follow from a grant of authority by such labor union."

The Court's charge on the issue of actual authority was in accordance with existing law and the labor contract in question. The provision calling for strict proof of union authorization of acts deemed violative of the collective bargaining agreement was not in any manner diluted or undermined by the Court's inclusion in the definition of actual authority as that authority which is "not expressly given" but which is nonetheless "necessary to carry out the expressed authority." In order to establish a breach of contract, plaintiff had to show by strict proof that the acts of

the union officials were actually authorized by the International or the Local. The strict proof provision did not impose upon the plaintiff the burden of proving that each act allegedly in violation of the labor agreement was expressly authorized by the defendants. Actual authority to perform an act may be expressly granted or implied from the grant of express authority. See, Twin City Plaza, Inc. v. Central Surety & Insurance Corp., 409 F.2d 1195, 1199 (8th Cir. 1969); Lux Art Van Service, Inc. v. Pollard, 344 F.2d 883, 887 (9th Cir. 1965).

There was ample evidence from which the jury could reasonably conclude that the defendant labor organizations actually authorized or subsequently ratified those acts which constituted a breach of the collective bargaining agreement. Al Plusch, who allegedly stated that he would sanction a walkout and then distributed strike signs from his car, was Assistant Regional Director of District 50. The evidence introduced at trial established that Plusch was authorized to negotiate agreements with Celotex regarding hours, wages, and working conditions and to advise and assist Local 12829 in all matters concerning labor-management relations. The Regional Director of District 50, Joseph DiStefano, attended a meeting of the striking Celotex employees during which a vote on the question of whether to return to work was taken. None of the Local officials reported to work throughout the strike. Based on the evidence outlined above and other evidence presented at trial, the jury concluded that the plaintiff established by strict proof that the acts or statements which gave rise to the unauthorized work stoppage were actually authorized or subsequently ratified by the defendants.

Furthermore, the Court's charge on the issue of actual authority was based squarely on the Supreme Court's language in the case of Brotherhood of Carpenters v. United States, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973 (1947), a decision involving the criminal prosecution of several labor unions for violations of the Sherman Act. At the time of the *Carpenters* action, the liability of trade unions for the acts of their agents was governed by § 6 of the Norris-La Guardia Act, 29 U.S.C. § 106. Section 6 provided that " . . . no association or organization participating . . . in a labor dispute, shall be held responsible or liable . . . except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof." The Supreme Court interpreted the above statutory provision so as to limit the liability of labor organizations to the instances where " . . . the particular act [of the agent] charged . . . had been expressly authorized, or *necessarily followed* from a granted authority, by the association . . . ." 330 U.S. at pp. 406–407, 67 S.Ct. at p. 781. (Emphasis added.)

Although the Taft-Hartley Act, 29 U.S.C. § 185, reinstituted traditional concepts of agency to the determination of a labor organization's responsibility for the acts of its agents and officials, the collective bargaining agreement in question here contained the strict proof requirement originally set forth in the Norris-La Guardia Act. In that the instant contractual provision was substantially identical to the language of the 1932 Act, the Court charged the jury in accordance with the Supreme Court's interpretation of the Act, as enunciated in the *Carpenters* case. The Court concludes that the jury instruction regarding the issue of actual authority accurately reflected the evidence adduced at trial and was proper in all respects.

Finally, defendants contend that the Court erred in refusing to submit to the jury the issue of whether plaintiff notified either defendant of the alleged violation of the labor agreement upon which the action was based. Subsection (b) of Article XIII provided that no valid cause of action shall arise from an al-

leged violation of the contract unless and until the complaining party has notified the other party "of the existence of the complaint, or contention, and the latter party after having been allowed a reasonable opportunity to correct same, shall fail or refuse to do so." The Court held at the close of the trial that the plaintiff had satisfied the notice requirement as a matter of law. Both defendants received prompt and complete notice of the underlying contractual dispute. On March 13, 1970, the day the walkout commenced, Plant Manager Talbot sent a telegram to Elwood Moffet, President of District 50. The telegram requested "immediate steps" to end the strike and pointedly noted that "our losses are substantial as each hour passes and for which we will have to seek redress." A similar telegram was dispatched to Joseph DiStefano, Regional Director of District 50, by Plant Manager Talbot. In addition, Talbot contacted Plusch, DiStefano and Robert Fulton by telephone on March 13, 1970, in an effort to bring an end to the unauthorized work stoppage.

Moreover, representatives of the International and the Local actively participated in union meetings and conferences with Celotex management concerning the work stoppage. The defendants received adequate notice of the work stoppage, the need for immediate action, and the intent of the plaintiff to seek redress for any economic loss suffered as a result of the unauthorized walkout. In that the general notice requirement set forth in Article XIII(b) was satisfied by the telegrams, telephone calls and the active involvement of International and Local officials in the aforementioned discussions, the Court refused to submit the issue of notice to the jury.

## ORDER

And now, to wit, this 17th day of December, 1974, upon consideration of the defendants' motion for a new trial on the issue of liability only, it is

Ordered that said motion is denied.